UNITED STATES v. VIAROPULOS.

(District Court, W. D. Pennsylvania. March 13, 1915.)

No. 157.

1. ALIENS ⬦68—NATURALIZATION—PROCEDURE—CONFORMITY TO STATUTE.

The provision of Naturalization Act June 29, 1906, c. 3592, § 4, 34 Stat. 596 (Comp. St. 1913, § 4352), that aliens may be admitted to citizenship "in the following manner and not otherwise," is intended to make the act exclusive of state legislation, and not to prevent citizenship where there

are slight variations from the exact language of the act, especially in view of section 27 (section 4382), which provides that substantially the forms therein prescribed shall be used.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 138–145; Dec. Dig. ☞68.]

2. ALIENS ☞68 — NATURALIZATION — DECLARATION OF INTENTION — AMENDMENT—POWER OF COURT.

Under Naturalization Act June 29, 1906, § 3 (Comp. St. 1913, § 4351), which gives exclusive jurisdiction over naturalization to courts of record, such court, under its inherent power to amend its record, may amend a declaration of intention filed therein, in which the name of the sovereign, allegiance to whom was renounced, was erroneously inserted by the clerk of the court, since such declaration is a record of the court.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 138–145; Dec. Dig. ☞68.]

3. ALIENS ☞68—NATURALIZATION—DECLARATION OF INTENTION—REQUISITES —NAME OF SOVEREIGN.

Under Naturalization Act June 29, 1906, § 4, providing that the declaration of intention shall state an intention to renounce all allegiance to any foreign sovereignty, and particularly, by name, the sovereignty of which the alien may be at the time a citizen or subject, an error in the name of the sovereign is not so material that it cannot be corrected by order of the court.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 138–145; Dec. Dig. ☞68.]

Application by the United States to cancel a certificate of citizenship issued to Demetrios Nekol Viaropulos. Petition dismissed.

E. Lowry Humes, U. S. Atty., of Pittsburgh, Pa.
A. C. Stein, of Pittsburgh, Pa., for defendant.

ORR, District Judge. This is a proceeding instituted by the United States in pursuance of the provisions of section 15 of the Naturalization Act of June 29, 1906 (Comp. St. 1913, § 4374), for the cancellation of a certificate of citizenship on the ground that such certificate was illegally procured. The government insists that the defendant was admitted to citizenship illegally, in that a proper declaration of his intention to become a citizen had not been previously made as required by law. The court permitted an amendment of the declaration of intention, because it was made to appear that by a mistake of the clerk of this court the declaration of intention had inadvertently expressed the intention of the declarant that he would renounce allegiance "particularly, by name," to Abdul Hamid II, when as a matter of fact he was a subject of the King of Greece.

Before considering the facts, it is well to have certain provisions of the act of Congress as amended under consideration. It is clear beyond question that Congress has placed the whole matter of the admission of aliens to citizenship in courts of record. The third section provides that exclusive jurisdiction to naturalize aliens as citizens of the United States be conferred upon the following specified courts: United States courts existing or established in any state, or certain territories named, and "also all courts of record in any state or territory now existing, or which may hereafter be created, having

a seal, a clerk, and jurisdiction in actions at law or equity, or law and equity, in which the amount in controversy is unlimited." There is a provision in that section that the jurisdiction of said courts should extend only to aliens resident within the jurisdiction of such courts, and a further provision that such courts should be furnished with such blanks as may be required for the naturalization of aliens. The most important feature of this section is that the courts shall be courts of record.

[1] Section 4 of the act provides:

"That an alien may be admitted to become a citizen of the United States in the following manner and not otherwise."

Here follows six subdivisions of said section. The first subdivision provides that the applicant—

"shall declare on oath before the clerk of any court authorized by this act to naturalize aliens, or his authorized deputy, in the district in which such alien resides, two years at least prior to his admission, and after he has reached the age of eighteen years, that it is bona fide his intention to become a citizen of the United States and to renounce forever all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly, by name, to the prince, potentate, state, or sovereignty of which the alien may be at the time a citizen or subject. And such declaration shall set forth the name, age, occupation, personal description, place of birth, last foreign residence and allegiance, the date of arrival, the name of the vessel, if any, in which he came to the United States, and the present place of residence in the United States of such alien: Provided, however, that no alien who, in conformity with the law in force at the date of his declaration, has declared his intention to become a citizen of the United States shall be required to renew such declaration: * * * Provided, further, that any person belonging to the class of persons authorized and qualified under existing law to become a citizen of the United States, who has resided constantly in the United States during a period of five years next preceding May 1st, 1910, who, because of misinformation in regard to his citizenship or the requirements of the law governing the naturalization of citizens has labored and acted under the impression that he was or could become a citizen of the United States and has in good faith exercised the rights or duties of a citizen or intended citizen of the United States because of such wrongful information and belief, may, upon making a showing of such facts satisfactory to a court having jurisdiction to issue papers of naturalization to an alien, and the court in its judgment believes that such person has been for a period of more than five years entitled upon proper proceedings to be naturalized as a citizen of the United States, receive from the said court a final certificate of naturalization, and said court may issue such certificate without requiring proof of former declaration by or on the part of such person of their intention to become a citizen of the United States, but such applicant for naturalization shall comply in all other respects with the law relative to the issuance of final papers of naturalization to aliens."

The second subdivision provides for the filing of the petition, what the petition shall contain, how the petition shall be verified, and what shall accompany it. The third subdivision provides for the oath of allegiance, which shall contain a renunciation and abjuration of all allegiance and fidelity "to any foreign prince, potentate, state or sovereignty, * * * of which he was before a citizen or subject." The fourth subdivision specifies the matters as to which the court shall be satisfied before admitting the applicant to citizenship. The fifth subdivision relates to aliens who have borne heredity titles, etc. The sixth subdivision of section 4 gives to the widow and

minor children of a declarant, who dies before he has actually been naturalized, the benefit of his declaration of intention.

To take up the act section by section would serve no useful purpose. It is sufficient to note that section 5 imposes upon the clerk the duty of posting notice of the final hearing of petitions for naturalization. Section 6 (section 4354) provides that in no case shall final action be had upon the petition until 90 days have elapsed after the posting of the notice. Section 7 (section 4363) provides that no person who disbelieves in or is opposed to organized government, etc., shall be naturalized. Section 9 (section 4368) provides that final hearing should be had in open court and that upon such final hearing the applicant and witnesses shall be examined under oath before the court. Section 11 (section 4370) gives the United States the right to be represented for the purpose of cross-examining the petitioner and witnesses at the final hearing. Sections 12, 13, and 14 (sections 4371–4373) relate to the duties of the clerk and other persons.

The provisions, at the beginning of section 4, that an alien may be admitted to become a citizen of the United States *"in the following manner and not otherwise,"* has given rise to some differences of opinion. It has created a tendency on the part of the representatives of the Bureau of Naturalization to criticize every variation, oftentimes the very slightest, from the exact language of the act. Practically the same language appeared in the second Naturalization Act passed by Congress on the 29th of January, 1795. See 1 Stat. at Large, 414. That act was entitled:

"An act to establish an uniform rule of naturalization, and to repeal the act heretofore passed on that subject."

The following quotation therefrom is sufficient:

"For carrying into complete effect, the power given by the Constitution, to establish an uniform rule of naturalization throughout the United States:

"Section 1. Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that any alien, being a free white person, may be admitted to become a citizen of the United States, or any of them, on the following conditions, and not otherwise."

The prior act, which was that of March 26, 1790 (1 Stat. at Large 103), did not contain the words last above quoted. In the meantime many of the states, notwithstanding the constitutional provision that Congress should have power "to establish an uniform rule of naturalization," had been exercising a supposed right of admitting aliens to citizenship in the respective states. At April term, 1792, in the United States Circuit Court for the Pennsylvania District, in the case of Collet v. Collet, 2 Dall. 294, 1 L. Ed. 387, Fed. Cas. No. 3,001, the court say:

"The question now agitated depends upon another question: Whether the state of Pennsylvania, since the 26th of March, 1790 (when the act of Congress was passed), has a right to naturalize an alien? And this must receive its answer from the solution of a third question; whether, according to the Constitution of the United States, the authority to naturalize is exclusive or concurrent? We are of opinion, then, that the states, individually, still enjoy a concurrent authority upon this subject, but that their individual authority cannot be exercised so as to contravene the rule established by the authority of the Union."

The court further say:

"The true reason for investing Congress with the power of naturalization has been assigned at the bar. It was to guard against too narrow, instead of too liberal, a mode of conferring the rights of citizenship. Thus, the individual states cannot exclude those citizens who have been adopted by the United States, but they can adopt citizens upon easier terms than those which Congress may deem it expedient to impose."

That decision, intervening as it did between the acts of 1790 and 1795, seems to have required that the language in the act of 1795 should indicate an exclusive method of naturalizing foreigners. Since Chirac v. Chirac, 2 Wheat. 260, 269 (4 L. Ed. 234), where Chief Justice Marshall uses this language, "That the power of naturalization is exclusively in Congress does not seem to be, and certainly ought not to be, controverted," the meaning of the constitutional provision never seems to have been seriously doubted. That every variation from the exact language of the act should have the effect of rendering illegal the action of the court would be a strained construction, especially in view of section 27, which sets forth forms to be used in the proceedings to which they relate. That section does not say, The following forms shall be used in the proceedings to which they relate, but it says, "*Substantially*" the following forms shall be used in the proceedings to which they relate.

[2] It is insisted by the representatives of the United States that the court has no power to permit an amendment to the declaration of intention. The court believes that it is an inherent power in every court to permit amendments of its records at any stage of the proceedings before final decree at least, and often after final decree and judgment has been entered. Confusion has arisen in the minds of lawyers and judges because of the many statutes of jeofails which were passed in England and are found in many of the states, and because of section 954 of the Revised Statutes of the United States (Comp. St. 1913, § 1591). But it should be borne in mind that those acts of the legislative bodies were passed to require the court to make amendments, and not for the purpose of enlarging the powers of the courts. They were passed in the interest of suitors and others, and were not passed to give the courts opportunity for doing justice in any more complete manner than was afforded before they were passed. In Tiernan's Executors v. Woodruff, 5 McLean, 135, 138, et seq., Fed. Cas. No. 14,027, there is a consideration of the power of the court to permit amendments, and reference was made to many English cases as well as to cases in the United States. It was there said:

"The question usually is: 'Will any injustice be done by what is proposed?' and, if not, the amendment is allowed."

In Tilton v. Cofield, 93 U. S. 163, 166 (23 L. Ed. 858), the case just cited is referred to by Mr. Justice Swayne, delivering the opinion, in the following language:

"Allowing amendments is incidental to the exercise of all judicial power, and is indispensable to the ends of justice. Usually, to permit or refuse rests in the discretion of the court; and the result in either case is not assignable for error. This subject was fully examined in Tiernan's Executors v. Woodruff, 5 McLean, 135 [Fed. Cas. No. 14,027]."

It may be helpful to take a view of the law of England as it existed at and prior to the time of the adoption of the Constitution of the United States. Blackstone, in his Commentaries (book 3, page 406 et seq.), gives an instructive account of the rise and history of amendments. From this account it appears that prior to the reign of Edward I (1272–1307) the courts had full authority to allow and make amendments in their records, and that some judges, having this power, "had made false entries on the rolls to cover their own misbehavior, and had taken upon them by amendments and rasures to falsify their own records." With a view to stopping such practices the king declared that the justices may not "rase their rolls, nor amend them, nor record them contrary to their original enrollment." Later in his reign, Edward I seized upon this law, originally intended to prevent abuses of the power of amendment, to heavily fine many of the judges who had made alterations in the records, whether made in the interest of justice or not. These proceedings led to the refusal of the judges to amend the most palpable errors, unless by the authority of Parliament. Blackstone says:

"The precedents then set were afterwards most religiously followed, to the great obstruction of justice, and ruin of the suitors, who have formerly suffered as much by this scrupulous obstinacy and literal strictness of the courts, as they could have done even by their iniquity."

To remedy the conditions thus brought about the various statutes of amendments and jeofails were passed; that is, to destroy precedents for denying amendments, which precedents had been established, not bcause of a want of power to make the amendments, but because of a fear on the part of the judges that, if made, the exercise of the power so to do might be misconstrued and used against them. That the influence of these precedents was felt as late as the time of King William and Mary (1689–1702) is shown in many of the cases reported in 1 Salkeld's Reports, beginning at page 46, and in 3 Salkeld's Reports, beginning at page 29. In one of these cases an amendment was refused because it was said it would make the defendant's plea false, when it was true when made; in another, that it would attaint the jury; and in another, where in a judgment sued upon the plaintiff's name was put for the defendant's, the amendment was refused, the court saying, "There may be such a judgment for aught we know."

There are many English cases of interest, of which the following have been selected as illustrative:

Bearecroft v. The Hundreds of Burnham and Stone (5 W. & M. 1693), Levinz's Reports, pt. 3, page 347. The plaintiff, Bearecroft, sent by wagon, guarded by servants, £4,000, from Worcester to London. While passing through the hundreds of Burnham and Stone, the wagon was robbed. Bearecroft brought an action against those hundreds, declaring upon an assault and robbery done to *himself*. At the time of the robbery, Bearecroft was at Worcester, 50 miles from the place where the robbery was committed. Issue having been joined, the case was ready for trial at the bar, and the jury appeared, but on account of other business the trial was adjourned to another day. In the meantime the inaccuracy of the complaint was discovered, and a

motion was made to amend by declaring upon a robbery of the servants. The time limited by the statute for bringing the action had passed. The report of the case states:

"And upon great debate and hearing counsel on both sides at several days, and view of two precedents * * * the court * * * ruled the declaration should be amended, notwithstanding the opposition of the defendant."

One of the precedents referred to was Chisly v. Becket (2 W. & M. 1690) Rot. 432. This was an action for false return of a member to Parliament, the plaintiff declaring on a custom to elect "per majorem, Ballives & Burgenses." At the trial it was discovered that the custom was to elect "per major' Balliv', Burgenses & Liberos Homines." The plaintiff moved to amend his declaration. Referring to this precedent, the report of the case of Bearecroft v. Hundreds, supra, says:

"And upon great deliberation and hearing of counsel, feeling that the time limited by the statute was elapsed, and so the action lost if 'twere not amended, the court ruled it should be amended, and so it was, notwithstanding the great Rasures, Obliterations and Interlineations it made in the record."

The other precedent referred to in Bearecroft v. Hundreds, supra, was not elaborated, the report merely stating:

"The other precedent produced was Trin. 16 Car. II, C. B., where in a quare impedit, after issue joined, the replication was amended."

Another case is The Executors of the Duke of Marlborough v. Widmore, 2 Strange's Reports, 890. The plaintiffs declared as executors on a promise to their testator, and issue was joined on a plea of the statute of limitations. The plaintiffs then moved to amend, by laying the promise to have been made to themselves. The amendment was allowed on the authority of Bearecroft v. Hundreds, 3 Lev. 347.

It is held in some of the federal cases that a declaration of intention is not such a record as may be the subject of amendment. To this we cannot agree, because of the conclusion reached as to the inherent power of a court over its own records, and of the power and duty to allow amendments of its records in the interest of justice. That declarations of intention are records of the court there seems to be no doubt. It was the view of Mr. Justice Field, as expressed in Re Langtry (C. C.) 31 Fed. 879, as that proceeding is reported. The learned justice is several times made to speak of declarations of intention as being "records of the court."

It is, of course, plain that no court has a right to amend the records of any other court, and therefore the decisions in cases where the petitions for citizenship have been filed in other jurisdictions than those in which declarations of intention are filed properly hold that the court in which the petitions are filed could not amend the declarations of intention on file in other courts. But when those courts go further than necessary for the decision of the particular cases before them, and express the view that no amendment to a declaration of intention can be allowed under any circumstances by any court, we think they go too far.

[3] As is hereinabove made to appear, the declaration of intention is the very foundation of the proceedings resulting in the judgment of

the court that the petitioner is entitled to citizenship. If by reason of a clerical error the clerk makes some mistake, to which the declarant, in his ignorance of our language and with his confidence in the integrity of public officials, accedes, should it be held that his declaration is of no value, when he presents it after the lapse of years as the foundation for his petition for citizenship? Under such circumstances, injustice is so apparent that it cannot be held to be the duty of the court to countenance it.

Looking at the matter in a practical way, it is seen that the form of declaration of intention, as expressed in the Naturalization Law, contains an expression of an "intention to renounce forever all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and particularly to ———, of which I am now a citizen (subject)." It evidently must have been in contemplation that the declarant might at the time of filing his petition owe allegiance to some other sovereignty than the one named in the declaration. It is generally believed to-day that certain of the islands in the Ægean Sea, which belonged to Turkey prior to the recent war with Greece, are now owned by Greece. It is stated (see the report of the Carnegie Foundation on the Investigation of the Balkan War of 1913) that Bulgaria surrendered a considerable portion of her territory to Roumania. As yet, it is impossible to ascertain the exact limits of territorial acquisitions by these governments. The question arises: Does the allegiance of the applicant for citizenship, as stated in the declaration of intention, continue until his petition for citizenship is presented? Does it change by the acquisition of the territory in which he was born and lived, before he came to this country, by another sovereignty, when he is not in the position either to remain in said territory under the new sovereignty or depart therefrom and resume his domicile and allegiance under the sovereignty of which he was formerly a subject? To meet contingencies like these it is evident that Congress used the broad language expressed in the form of declaration of intention, so as to cover allegiance which might be owing to any possible sovereignty. The amendment, therefore, of the name of the particular sovereign of which the declarant was a subject is of scarcely any importance. Especially is this pressed home by the thought that the names of the sovereign of the same country may be changed by death overnight.

In this case it appears from the petition and the answer, which must be taken as true, because no testimony was taken, or apparently required, that the respondent herein stated to the clerk at the time of making his declaration of intention that he was a citizen of Greece and a subject of the King of Greece, and that he had departed from Smyrna, Turkey, for this country; that the clerk, by mistake, inserted in the declaration the name of the Sultan of Turkey instead of the name of the King of Greece; that the declaration was made in this court on the 20th of November, 1906, and the mistake was not discovered until about September 30, 1911, when he presented a petition asking that the declaration of intention be amended, which was allowed, and thereupon, in due course, his petition for citizenship came on for hear-

ing, and an order was made admitting him to citizenship on January 18, 1912.

The court is satisfied that the certificate of naturalization was not illegally procured. Therefore the petition of the United States must be dismissed.