No. 18,913.

CARRIE JOHNSON, *Appellee*, v. ERICK OLSON et al., *Appellees*, and ANNA K. JACOBSON et al., *Appellants*.

SYLLABUS BY THE COURT.

1. INHERITANCE—*Descents and Distributions—Rights of Aliens to Inherit.* In the absence of a governing treaty the repeal of the constitutional provision that no distinction shall be made between citizens and aliens in the inheritance, enjoyment and descent of property and the adoption in its place of the provision that the rights of aliens in reference to the inheritance, enjoyment and descent of property shall be regulated by law without enacting a statute regulating the inheritance of property by aliens revives and reinstates the common-law rule that an alien can not inherit from a deceased citizen.

2. SAME—*Treaty between United States and Sweden.* Article 6 of the treaty between the United States and Sweden, originally negotiated in 1783 and revived in article 17 of the treaty of 1827, relating to the disposition of "goods and effects," does not refer to or embrace real estate.

3. SAME—*Alien Can Not Inherit Lands of a Deceased Citizen.* The intestate, who was the owner of land in Kansas, died without wife or issue, his father and mother having previously died. Among his surviving brothers and sisters some were aliens and some citizens of the United States. One of his sisters who was an alien and alive when he died had two children who were citizens of the United States. *Held,* that the sister, being an alien, could not inherit a share of the estate, and that after her death her children, although citizens, were incapable of inheriting through her.

Appeal from Clay district court; SAM KIMBLE, judge. Opinion filed July 7, 1914. Affirmed.

*George L. Davis,* of Clay Center, for the appellants.

*F. B. Dawes, R. C. Miller, F. L. Williams,* and *J. L. Hogin,* all of Clay Center, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: The purpose of this action is the partition of a tract of land in Clay county which had been owned by Olaf Olson, who died intestate, unmar-

ried and without children on January 3, 1911. His parents, who died prior to the time of his death, were citizens of Sweden and never had been citizens of the United States. They had seven children besides Olaf, and their names were Lizzie Person, Anna Anderson, Brita Olson and Carrie Johnson, sisters of Olaf, and Erick Olson, Zackarias Olson and Lars Olson, his brothers. Only three of these were citizens of the United States, Carrie Johnson, Erick Olson and Zackarias Olson, but Erick died without wife or children prior to the death of Olaf. The brother Lars Olson, deceased, was a citizen of Sweden and his only children and heirs were citizens of Sweden and never were citizens of the United States. The sister Lizzie Person was a citizen and resident of Sweden at the death of Olaf and had never been a citizen of the United States. Before the death of Olaf his sister Brita Olson died a citizen of Sweden, and she never had been a citizen of the United States, but she left four children, two of whom were and always had been citizens of Sweden and two of them, Betty Jerner and Olaf Olson, were residents and citizens of the United States when their uncle, Olaf, died. Another sister, Anna Anderson, was living at the time Olaf died and had always been a citizen of Sweden. She died in 1912, some time after this action was commenced, leaving four children, two of whom were citizens of Sweden and never citizens of the United States, and two of them, Anna K. Jacobson and Mary Burge, were citizens of the United States at the time that Olaf died. The trial court held that those who were aliens when Olaf died were not entitled to inherit any share in the land; that his sister Carrie Johnson, and his brother Zackarias Olson, citizens of the United States, were each entitled to an undivided one-third of the land; that Betty Jerner and Olaf Olson, citizens of the United States and children of an alien mother who was not living when Olaf died, were each entitled to one-sixth of the land; but that Anna K. Jacobson and Mary Burge, although citizens of the

United States, did not inherit any share as their alien mother was living when Olaf died. Anna K. Jacobson and Mary Burge are the only relatives of the deceased who claimed a part of his estate other than those to whom it was awarded, and they are appealing from the decision holding that they were not entitled to inherit.

Whether they can inherit from their deceased uncle depends upon the interpretation of the treaty between the governments of Sweden and the United States and of our statutes of descent and distribution. If the appellants can inherit it must be through their mother, who was a citizen of Sweden when Olaf Olson died and who had never been a citizen of the United States.

Originally aliens and citizens were upon an equality in Kansas so far as the inheritance of property was concerned. The constitution provided that:

"No distinction shall ever be made between citizens and aliens in reference to the purchase, enjoyment or descent of property." (Bill of Rights, § 17, Compiled Laws 1885, § 99.)

At the general election in 1888 this provision was stricken from the constitution and in its place a provision was inserted providing, among other things, that:

"The rights of aliens in reference to the purchase, enjoyment or descent of property may be regulated by law." (Bill of Rights, § 17, Gen. Stat. 1909, § 99.)

Since that time there has been no legislation on the subject except chapter 3 of the Laws of 1891 which provided for the early disposition of real estate then owned by nonresident aliens, and therefore we have no constitutional or statutory provisions regulating the inheritance of property by aliens. In the absence of any regulation or provision on the subject the rule of the common law will control. In 8 Cyc. 377, it is said:

"When a statute abrogating a rule or principle of the common law is repealed, the common-law principle or rule is *ipso facto* revived, unless there is something to show a contrary intent on the part of the legislature."

The common law was in force when the original provision of the constitution permitting aliens to inherit was adopted, and when it was abrogated without the substitution of a regulation or statute on the subject of inheritance the common law was revived. It is a settled principle of the common law that there can be no inheritance by, through or from an alien, and this principle has been applied in Kansas, where it was declared that:

"It is also the well-recognized rule of the common law that an alien can not inherit the lands of a deceased citizen." (*The State v. Ellis,* 72 Kan. 285, 288, 83 Pac. 1045.)

The supreme court of Iowa held that the common law controlled in the absence of legislation in regard to the rights of an alien to inherit, upon the theory that statutes as well as constitutional provisions are to be construed in reference to the principles of the common law, and that where they are silent upon the subject the principles of the common law will govern. It was said that:

"The statute regulating the descent of property in Iowa, at the adoption of the constitution, was that of February 13, 1843, and provides that the lands of any person dying intestate, shall descend in equal shares to his children. This evidently means such children as have inheritable blood; for it being an inflexible rule at common law, that aliens, resident or non-resident, are not heirs, can not take by descent, nothing less than a plain and express provision in relation to them will change the rule." (*Stemple v. Herminghouser,* 3 G. Greene (Iowa), 408, 410; *State v. Rollins,* 8 N. H. 550; *Nickels v. Kane's Adm'r,* 82 Va. 309; *Ins. Co. Valley of Virginia v. Barley's Adm'r,* 16 Grattan (Virginia), 363; 6 A. & E. Encycl. of L. 931.)

This would be the controlling rule in the absence of a treaty regulation, but it is contended that under the terms of a treaty between the United States and Sweden the appellants take a share in the real estate owned by

their uncle at the time of his death. . A treaty between these governments was made on April 3, 1783, and in article 6 there was a stipulation regulating the property rights of the citizens of the contracting parties. The article was revived and inserted without change in the treaty of 1827. (8 U. S. Stat. at Large, pp. 60, 346, 354.) In the article it was agreed that:

"The subjects of the contracting parties in the respective states, may freely dispose of their goods and effects either by testament, donation or otherwise, in favour of such persons as they think proper; and their heirs in whatever place they shall reside, shall receive the succession even *ab intestato,* either in person or by their attorney, without having occasion to take out letters of naturalization. These inheritances, as well as the capitals and effects, which the subjects of the two parties, in changing their dwelling, shall be desirous of removing from the place of their abode, shall be exempted from all duty called '*droit de detraction,*' on the part of the government of the two states respectively." (8 U. S. Stat. at Large, p. 64.)

The original treaty is published in the English and French languages as if both were originals, and the dispute is as to the meaning of the clause, "goods and effects," which is given in the French copy as *"fonds et biens."* Do these words refer to personal property only, or do they embrace real estate? It is contended that the French word *"biens"* means real as well as personal property, and a note to section 13 of Story on Conflict of Laws, 8th ed., is quoted, as follows:

"The term *biens,* in the sense of the civilians and continental jurists, comprehends not merely goods and chattels, as in the common law, but real estate."

Bouvier, however, defines the word to mean "Property of every description, except estates of freehold and inheritance." The same definition is given by Black in his Dictionary of Law. It is sometimes said that Lord Coke has defined the word as meaning real property,

but it appears that he referred to real chattels rather than to real estate itself. He said:

"*Goods, biens, bona,* includes all chattels, as well reall as personall." (1 Coke on Littleton, 1st Am. ed., § 177, subdiv. 118*b*.)

Burrill's Law Dictionary gives the same definition. In 5 Cyc. 686, the word "*biens*" is defined as "Property of every description, except estates of freehold and inheritance; goods." The court of appeals of New York gave the following definition:

"The corresponding Norman French term '*biens*' is said to include property of every description, except estates of freehold." (*McCaffrey v. Woodin,* 65 N. Y. 459, 468, 22 Am. Rep. 644.)

Most of the authorities appear to hold that the word does not mean real estate, but assuming that there is a real difference of opinion in the authorities as to the meaning of the term, we should then examine the treaty as drawn in the English language. The intention of the makers of a treaty is to be construed in the same way and under the same general rules as are used in interpreting contracts between individuals. (38 Cyc. 969.) The treaty must not only be construed as a whole, but where it is executed in two languages both are originals and must be construed together. (*United States v. Percheman,* 32 U. S. 51, 8 L. Ed. 604.) The terms used were intended to be identical, and if the word "*biens*" is used in more than one sense and there is doubt as to the meaning in which it was used in the French copy, we can look at the corresponding words used in the English version, and we find these to be words about the meaning of which there can be little, if any, doubt. The corresponding expression of "*fonds et biens*" is "goods and effects," and that expression in its natural and ordinary sense means movable personal property and not real estate. Even if the treaty had been only in the French language and the makers of it had translated it into English, using the words "goods

Johnson v. Olson.

and effects," it must have been inferred, in view of the different meanings given to the French expression, that the makers of the treaty intended to use it in the sense imported by the phrase "goods and effects." That phrase is in frequent use and includes only personal property, unless the context in which it is employed shows clearly that it was intended to have a peculiar and more extended meaning. "Goods" is defined as "wares, commodities and chattels," and "effects" has a more extended meaning, but when it is used in connection with "goods," as here, it clearly means personal property and not real estate. So it has been held under a statute providing for the attachment of "goods and effects" that the expression did not include an estate in lands. The supreme court of Pennsylvania in deciding the question said:

"Their meaning is free from all ambiguity or doubt, whether used in a popular, a lexicographical, or a legal sense. The word 'goods' is always used to designate wares, commodities and personal chattels. The word 'effects' is the equivalent of the word 'movables.'" (*Vandergrift & Forman's Appeal*, 83 Pa. St. 126, 129.)

In Vermont the words "*goods, effects* and *credits*" were used in a trustee statute, and the supreme court of that state held that real estate was not embraced within the term "effects," the court saying:

"That word, as ordinarily used, is understood to mean *goods, moveables, personal estate;* and I am not aware, that the word *effects* has ever been defined by any legal writer, as including real estate." (*Hunter v. Case et al. & Tr.*, 20 Vt. 195, 197.)

An Alabama statute provided for a landlord's lien on "goods, furniture and effects," and in a controversy it was held that "effects," as there used in connection with "goods," meant property of the same kind as "goods" and "furniture," and did not mean real estate. (*McKleroy v. Cantey & Randolph*, 95 Ala. 295, 11 South. 258; *First Nat. Bank of Birmingham v. The Consol. Electric Light Co.*, 97 Ala. 465, 12 South. 71.)

A power of attorney was executed authorizing a party to sell "claims and effects," and it was held that the word "effects," coupled, as it was, with "claims," did not embrace real estate. (*De Cordova v. Knowles,* 37 Tex. 19.)

. In *Keyes v. The Milwaukee and St. Paul Railway Company,* 25 Wis. 691, it was held, under a garnishment statute providing for the attachment of "property and effects" in the hands of another, that the word "effects" meant personal property capable of being *seized* and sold under execution. In *Planters' Bank v. Sharp et al.,* 47 U. S. 301, 12 L. Ed. 447, the court, in defining the word "effects," remarked:

"So, in respect to *effects,* it has been held, when the word is used alone, or *simpliciter,* it means all kinds of personal estate. . . . But if there be some word used with it, restraining its meaning, then it is governed by that, or means something *ejusdem generis.*" (p. 321.)

In *Doe d. Haw v. Earles,* 15 M. & W. (Eng.) 450, the court held that:

"The meaning of the word 'effects' is, in common parlance, confined to personal things; and it has been judicially decided to bear that meaning, unless the context shows that the testator used it in a more comprehensive sense. This was held by all the Court of King's Bench, in the cases of *Camfield v. Gilbert,* 3 East, 510, and of *Doe v. Langlands,* 14 East, 430." (p. 456.)

It is true that in interpreting wills the courts, to prevent intestacy, have sometimes expanded the meaning of the term "effects" so as to include real property, but as the word is ordinarily used in contracts and statutes the courts uniformly hold that the term is not sufficiently comprehensive to include real estate and when coupled with "goods" or other like terms, descriptive of personal property, it includes nothing except movable personal property. This is illustrated in a case note in 12 L. R. A., n. s., 661.

In *Meier v. Lee et al.*, 106 Iowa, 303, 76 N. W. 712, the supreme court in interpreting the treaty under consideration gave a definition of the words "goods and effects" used in the treaty and held that it did not include real estate. In defining the words the court said:

" 'Goods: A valuable possession or piece of property; especially, and almost universally, in the plural, goods, wares, commodities, chattels.' 'Effects: Goods, movables, personal estate.' . . . 'Goods and effects' have never been held to include real estate." (p. 308.)

The supreme court of Illinois interpreted the same provision of the treaty between the United States and Sweden and made a contrary decision. (*Adams v. Akerlund*, 168 Ill. 632, 48 N. E. 454.) The court proceeded on the theory that the words *"fonds et biens"* had the same meaning as the expression "goods and effects," and while it was conceded that the word "effects" when used in connection with the word "goods," as a general thing, means personal and not real property, it nevertheless held that the context of the article in which the expression occurs indicated an intention to include real estate. It was said that the words "heirs," "succession," and "inheritances," as there used, "are very significant words in determining the meaning to be given to the word 'effects.' " (p. 638.) After defining these terms and showing that they apply to real property the court came to the conclusion that:

"The terms of the treaty were intended to include real estate as well as personalty, and that the word, 'effects,' was intended to have a broader meaning which includes both land and personalty." (p. 640.)

In holding that the words "heirs," "succession" and "inheritances" gave the term "effects" an unusual meaning that court apparently overlooked the fact that those words are stereotyped ones which are commonly employed in articles or provisions of treaties which deal expressly and unquestionably with personal property

alone. For instance, in the treaty of 1845 with Bavaria there is a provision stipulating as to the disposition of personal property by donation or otherwise which provides that citizens, "their heirs, legatees and donees," shall "succeed to their said personal property," using terms which it is said are appropriate only to real property. Likewise, in the treaty of 1829 with Austria-Hungary an article stipulating as to "personal goods" only the terms "succeed" and "representatives" are used, it being agreed that citizens of either nation "shall succeed to their personal goods, whether by testament or *ab intestato*." In the treaty with Russia of 1832 a provision of the treaty referring to personal property only used the expression of succeeding to personal property by testament or *ab intestato*. In a treaty of 1826 with Denmark it was provided that no unequal duties, charges or taxes of any kind should be levied on "personal property, money, or effects" of the respective citizens or subjects or upon the removal of the same from either "upon the inheritance of such property, money, or effects, or otherwise than are or shall be payable in each State, upon the same, when removed by a citizen or subject of such State." There they used the word "inheritance" of personal property —a term which, it is said, gives character and a peculiar meaning to the word "effects" in the treaty in question. In the treaty of 1902 with Spain, in stipulating as to the power to dispose of personal property, the terms "heirs, legatees, and donees" are used, and it is provided that the citizens of either shall "succeed" to personal property. In a treaty with Great Britain made in 1899 a provision dealing with personal property applies all these terms which have been mentioned to personal property. The same is true in treaties with Bolivia, Brazil, Italy, Prussia, Switzerland, Württemberg, Brunswick and Lüneberg, Colombia, Hesse, Mecklenberg-Schwerin and Saxony. In fact, it appears that in most, if not all, the treaties negotiated between this

government and other nations these so-called real estate terms are used in provisions which expressly relate to personal property and personal property only, and this without regard to whether the treaty is with a civil-law nation or a common-law nation. The treaties we have examined are found in Compilation of Treaties in Force (37 Senate Documents, 58th Congress, second session), which has been prepared from time to time under the authority of congress. The fact that these terms, which it is argued are only applicable to real estate, have been generally applied to personal property hardly justifies the court in the inference that in the use of the terms "goods and effects" the contracting parties intended to include real estate. The common use of the terms "heirs," "succession" and "inheritance" in treaty provisions which expressly and without doubt refer to personal property neutralizes the argument that the use of the same in connection with the words "goods and effects" changes an expression which means personal property into one which means real estate. The supreme court of Illinois was led to the view that an expression which by itself means personal property was intended to embrace real estate because of the use of terms which it appears are generally applied in provisions for the disposition of personal property only. The supreme court of Nebraska, in *Erickson v. Carlson et al.*, (— Neb. 1914) 145 N. W. 352, with little discussion adopts the view taken by the Illinois court, and the supreme court of Washington, in an inheritance case, appears to take the same view. (*In re Stixrud's Estate*, 58 Wash. 339, 109 Pac. 343).

We are inclined to agree with the supreme court of Iowa and hold that the words "goods and effects" as used in the article in question do not mean or embrace real estate. It appears to us that the context in which the words "heirs," "succession" and "inheritance" were used strongly tends to support that view and to

show that the makers of the treaty did not intend to expand the meaning of "goods and effects" but were referring to movable property only. In the sentence following the one containing the words "heirs" and "succession," and which it is said expanded the meaning of "goods and effects" so as to make the words cover real property, it is provided:

"These inheritances, as well as the capitals and effects, which the subjects of the two parties, in changing their dwelling, shall be desirous of removing from the place of their abode, shall be exempted from all duty called '*droit de detraction*,' on the part of the government of the two states respectively." (8 U. S. Stat. at Large, p. 64.)

The expression "these inheritances" refers to "goods and effects," the property which the parties are to receive by inheritance or succession, and is such property as can be removed from the place of their abode when they change their dwelling. It thus appears that the "goods and effects" which they are to inherit and to receive by succession is movable property and not real estate.

As the treaty does not apply to real estate and as an alien is not allowed to inherit real property under the law as it exists in Kansas, it follows that Anna Anderson, who was still alive and an alien when her brother died, was not entitled to inherit a share of the land owned by her brother. Can her children, the appellants, inherit? The rule of descent is fixed by the statute. As Olaf Olson left no wife or issue his estate would descend to his father and mother if they were alive and capable of taking by descent. (Gen. Stat. 1909, § 2953.) The rule of the statute, in effect, is that if one of the parents be dead the estate goes to the surviving parent, and if both be dead it descends as if they had outlived the intestate and died in the ownership and possession of the property. (Gen. Stat. 1909, § 2954.) Neither of the parents of Olaf Olson was living at the time of his death and so the

Johnson v. Olson.

.property descended the same as it would have done if his parents had outlived him and had been resident owners of the property at the time of their death. Upon the death of the intestate the descent is cast at once and the title to the property would have passed to their sons and daughters, the brothers and sisters of the intestate, who were capable of inheriting, but, as we have seen, only those of them that have the inheritable blood or quality can inherit a share of the estate. At the moment of Olaf's death the title to the land owned by him passed at once to those capable of taking. Anna Anderson, who was living, would have taken a share but for alienage, and the appellants, her children, can only claim through her, and she being incapable of inheriting the inheritance was obstructed and the estate diverted to those who could take. This was, in fact, determined in *Smith v. Lynch,* 61 Kan. 609, 60 Pac. 329. (See, also, *Cramer v. McCann,* 83 Kan. 719, 112 Pac. 832.) In *Walker v. Potomac Ferry Company,* 10 D. C. 440, it was said that:

"It is impossible for the children of a parent still alive to derive an inheritance, when the mother was herself incapable of acquiring that inheritance on account of alienage." (p. 442.)

See, also, *Meier v. Lee et al.,* 106 Iowa, 303, 76 N. W. 712; *The People v. Irvin,* 21 Wendell (N. Y. Supr. Ct.), 128; *Renner. v. Muller,* 44 N. Y. Superior Ct. Rep. 535; Note, 31 L. R. A. 177.

The court therefore ruled correctly in holding that the appellants were not entitled to a share in the land of the intestate, and they are the only ones who complain of the ruling of the court.

The judgment will be affirmed.