No. 26,501.

THE STATE OF KANSAS, ex rel. GEORGE D. MINER, County Attorney of Ellsworth County, *Appellee*, v. JAMES REARDON, as Administrator, etc., et al., *Appellants*.

SYLLABUS BY THE COURT.

1. TREATIES—*Suspension or Annulment by Declaration of War—Provision Permitting Inheritance*. A declaration of war between the parties to a treaty does not of itself suspend or annul a provision therein permitting land in one country to be inherited by a citizen of the other.

2. SAME—*Notification of Revival—Provisions Affected*. A treaty concerning a reciprocal privilege of inheritance made between this country and a German state, being of a character compatible with war and therefore not affected by it, was not abrogated by the omission of the United States to give notification of its revival in accordance with the procedure outlined in the treaty of Versailles and adopted in the treaty between the United States and Germany signed August 25, 1921, and proclaimed November 14, 1921.

Appeal from Ellsworth district court; DALLAS GROVER, judge. Opinion filed April 10, 1926. Reversed.

*Ira E. Lloyd, Norris F. Nourse,* both of Ellsworth, and *G. Detjen,* of St. Louis, Mo., for the appellants.

*Charles B. Griffith,* attorney-general, *Roland Boynton,* assistant attorney-general, *George D. Miner,* county attorney, and *Samuel E. Bartlett,* of Ellsworth, for the appellee.

The opinion of the court was delivered by

MASON, J.: Adam Leitzbach, a citizen of the United States residing in Ellsworth county, died intestate October 15, 1924, owning land in that county, and leaving no relations except such as were aliens, being citizens of Germany residing in Prussia. The state brought this action against these relations asking to be adjudged the owner of the land for the benefit of the school fund, on the ground that being aliens they were incapable of inheriting it, there being no statute qualifying them. (*Johnson v. Olson,* 92 Kan. 819, 142 Pac. 256.) The relations answered alleging in substance that they were entitled to sell the land and withdraw the proceeds within a reasonable time under the provisions of article 14 of the treaty between the United States and Prussia negotiated in 1828 and proclaimed March 14, 1829. A demurrer to the answer was sustained and this appeal is taken from that ruling.

Treaties, 38 Cyc. pp. 973 n. 57, 975 n. 82; 11 A. L. R. 180; 10 R. C. L. 155.

The state contends that the treaty referred to ceased to be effective by reason of the war between the United States and Germany, or if not, then that consequence resulted from the omission of the United States to take affirmative steps to revive it or keep it in force after the ratification of the treaty with Germany proclaimed November 14, 1921.

1. In upholding the right of a subject of Austria-Hungary to inherit (that is, to sell within a limited time) land of an intestate who died December 7, 1917, twenty days after war was declared between the United States and that country, the court of appeals of New York held without dissent (although one judge limited his concurrence to the result) that the portion of a treaty permitting the inheritance (or its equivalent) by a citizen of one of the nations of land in the other is not annulled by war between them. (*Techt v. Hughes*, 229 N. Y. 222.) The federal supreme court denied a petition for a writ of certiorari. (254 U. S. 643.) The treaty there involved was that of 1848, which extended privileges granted by and was to that extent supplementary to that of 1829, which described itself as one of commerce and navigation. In the opinion, written by Judge Cardozo, it was said:

"The effect of war upon the existing treaties of belligerents is one of the unsettled problems of the law. . . . This does not mean, of course, that there are not some classes of treaties about which there is general agreement. Treaties of alliance fall. Treaties of boundary or cession, 'dispositive' or 'transitory' conventions, survive. . . . So, of course, do treaties which regulate the conduct of hostilities. . . . Intention in such circumstances is clear. These instances do not represent distinct and final principles. They are illustrations of the same principle. They are applications of a standard. When I ask what that principle or standard is, and endeavor to extract it from the long chapters in the books, I get this, and nothing more, that provisions compatible with a state of hostilities, unless expressly terminated, will be enforced, and those incompatible rejected.

.　.　.　.　.　.　.　.　.　.　.　.　.　.

"I do not overlook the statements which may be found here and there in the works of authors of distinction . . . that treaties of commerce and navigation are to be ranked in the class of treaties which war abrogates or at least suspends. Commerce is friendly intercourse. Friendly intercourse between nations is impossible in war. Therefore, treaties regulating such intercourse are not operative in war. But stipulations do not touch commerce because they happen to be embodied in a treaty which is styled one to regulate or encourage commerce. . . . There is a line of division, fundamental in importance, which separates stipulations touching commerce *between* nations from those touching the tenure of land *within* the territories

of nations. . . . Restrictions upon ownership of land by aliens have a history all their own, unrelated altogether to restrictions upon trade. . . . When removed, they cease to exist for enemies as well as friends, unless the statute removing them enforces a distinction. . . . More than that, the removal, when effected by treaty, gives reciprocal privileges to the subjects of each state, and is thus of value to one side as much as to the other. For this reason, the inference is a strong one, as was pointed out by the master of the rolls in *Sutton v. Sutton* (1 Russ. & M. 664, 675) that the privileges, unless expressly revoked, are intended to endure. . . .

"No one can study the vague and wavering statements of treaties and decisions in this field of international law with any feeling of assurance at the end that he has chosen the right path. One looks in vain either for uniformity of doctrine or for scientific accuracy of exposition. There are wise cautions for the statesman. There are few precepts for the judge. All the more, in this uncertainty, I am impelled to the belief that until the political departments have acted, the courts, in refusing to give effect to treaties, should limit their refusal to the needs of the occasion; that they are not bound by any rigid formula to nullify the whole or nothing; and that in determining whether this treaty survived the coming of war, they are free to make choice of the conclusion which shall seem the most in keeping with the traditions of the law, the policy of the statutes, the dictates of fair dealing, and the honor of the nation." (pp. 240-247.)

In a note to the case quoted from (11 A. L. R. 180) considerations are suggested tending to support the contrary view, but the editor adds (p. 182) that the tendency appears to be toward a limitation of the general principle that treaties are annulled by a war arising between the contracting parties.

It is too clear for controversy that not all treaties are annulled by a state of war. A treaty which establishes a permanent status—such, for instance, as one fixing a boundary—plainly is not intended to be affected, and is not affected by war. Neither will a property right of an individual already vested under the terms of an existing treaty be disturbed by it. (*Society, etc., v. New-Haven*, 21 U. S. 464, 494.) But the same reasoning does not apply to a treaty provision that aliens may inherit, for that is prospective in its operation, and if it is to survive a declaration of war it must be upon other grounds—that is, an inference that it is intended to be enforced notwithstanding the parties are at war must be based upon different considerations. Upon the grounds indicated in the opinion in the Techt-Hughes case we regard the reciprocal privilege of inheritance as not so related to the carrying on of a war as to create a presumption of an intention it should operate only in time of peace. Practically the only important question is which way the presumption lies, for of course either belligerent by affirmative action may

use its own pleasure as to suffering the prewar condition to continue. We therefore hold that the right of the defendants to inherit was not cut off by the declaration of war between this country and Germany.

2. The question whether the capacity of citizens of Germany to inherit land in this country was ended by what took place after the war depends upon the interpretation of the treaty between the United States and Germany proclaimed November 14, 1921, and of portions of the Versailles treaty referred to therein. The treaty to which the United States was a party contains these clauses:

"Germany undertakes to accord to the United States, and the United States shall have and enjoy, all the rights, privileges, indemnities, reparations or advantages specified in the aforesaid joint resolution of the congress of the United States of July 2, 1921, including all the rights and advantages stipulated for the benefit of the United States in the treaty of Versailles which the United States shall fully enjoy notwithstanding the fact that such treaty has not been ratified by the United States.

"With a view to defining more particularly the obligations of Germany under the foregoing article with respect to certain provisions in the treaty of Versailles, it is understood and agreed between the high contracting parties:

"(1) That the rights and advantages stipulated in that treaty for the benefit of the United States, which it is intended the United States shall have and enjoy, are those defined in section 1, of part IV, and parts V, VI, VIII, IX, X, XI, XII, XIV, and XV.

"The United States in availing itself of the rights and advantages stipulated in the provisions of that treaty mentioned in this paragraph will do so in a manner consistent with the rights accorded to Germany under such provisions.

"(2) That the United States shall not be bound by the provisions of part I of that treaty, nor by any provisions of that treaty, including those mentioned in paragraph (1) of this article, which relate to the covenant of the League of Nations, nor shall the United States be bound by any action taken by the League of Nations, or by the council or by the assembly thereof, unless the United States shall expressly give its assent to such action.

.    .    .    .    .    .    .    .    .    .    .    .

"(5) That the periods of time to which reference is made in article 440 of the treaty of Versailles shall run, with respect to any act or election on the part of the United States, from the date of the coming into force of the present treaty." (Articles I and II, pp. 120-2, Treaties and Conventions, Statutes, etc., passed at first session of sixty-seventh congress, 42 U. S. Stat. 1939, 1942.)

Article 289 of the treaty of Versailles, which is a part of chapter 5, section 2, of part 10, reads:

"Each of the allied or associated powers, being guided by the general principles or special provisions of the present treaty, shall notify to Germany

the bilateral treaties or conventions which such allied or associated power wishes to revive with Germany.

"The notification referred to in the present article shall be made either directly or through the intermediary of another power. Receipt thereof shall be acknowledged in writing by Germany. The date of the revival shall be that of the notification.

"The allied and associated powers undertake among themselves not to revive with Germany any conventions or treaties which are not in accordance with the terms of the present treaty.

"The notification shall mention any provisions of the said conventions and treaties which, not being in accordance with the terms of the present treaty, shall not be considered as revived.

"In case of any difference of opinion, the League of Nations will be called on to decide.

"A period of six months from the coming into force of the present treaty is allowed to the allied and associated powers within which to make the notification.

"Only those bilateral treaties and conventions which have been the subject of such a notification shall be revived between the allied and associated powers and Germany; all the others are and shall remain abrogated.

"The above regulations apply to all bilateral treaties or conventions existing between all the allied and associated powers signatories to the present treaty and Germany, even if the said allied and associated powers have not been in a state of war with Germany."

The preamble to the Versailles treaty concludes with these words, following the names of the negotiators on the behalf of Germany:

"Acting in the name of the German empire and of each and every component state,

"Who having communicated their full powers found in good and due form have agreed as follows:

"From the coming into force of the present treaty the state of war will terminate. From that moment and subject to the provisions of this treaty official relations with Germany, and with any of the German states, will be resumed by the allied and associated powers."

Considered by itself the provision that each of the allied or associated powers shall notify to Germany the treaties which it wishes to revive may readily be interpreted as not applying to any treaty or part of a treaty which was not suspended or annulled by the war, since there is no occasion to revive a treaty or part of one which has remained continuously in force. But the fact of the regulations regarding revival being expressly made applicable to treaties with countries with which Germany had not been at war suggests that the treaties which were no longer in force were not the only ones to be revived. Moreover the statement as to the effect of nonrevivor is not merely that treaties which have not been the

subject of notification shall *remain* abrogated. The language is, "all the others *are* and shall remain abrogated." However, the treaty with Germany did not make the terms of article 289 of the treaty of Versailles binding on the United States. It merely extended to the United States the rights and advantages stipulated in that article for its benefit. By that means this country was given the privilege of reviving any treaties (or parts of treaties) with Germany (or any of the German states) which had been annulled or suspended by the war, but it does not follow that a part of a treaty which remained unimpaired required revival in order to remain in force, even if that was the effect of the treaty of Versailles as between the parties to it in a like situation.

It seems obvious that there was no intention of absolutely wiping out all former treaties between the United States and Germany. There was necessarily an implied exception in favor of those entered into to establish a permanent status, such as one settling a boundary dispute. Nor can it have been intended to devest property rights that had already vested under existing treaties. The question to be determined is whether the same considerations which are held to warrant classifying treaty provisions granting a reciprocal privilege of inheritance with those which are not affected by war, may not also warrant classifying them with those that were not intended to be nullified by the failure to have them formally revived after the war. To hold in the affirmative requires some extension of the principle, but all the arguments in favor of its application in the one case tend, although with perhaps less force, to justify its application in the other. With respect to old treaties concerning, for instance, commerce, which became inoperative by reason of the war because inconsistent with it, this government may well have thought it better there should be no revival, leaving the matters affected to be adjusted by subsequent negotiations. But it is difficult to believe there was a purpose to withdraw the privilege of individuals to inherit, which is not incompatible with hostilities, and which the war itself had not disturbed. We hold that the provision of the treaty with Prussia so far as it related to this subject remained in force until it was replaced by a like provision of the treaty with Germany signed December 8, 1923, and proclaimed October 14, 1925.

The defendants suggest that the League of Nations clause of article 289 of the treaty of Versailles, making the League the arbitrator of any difference of opinion in connection with the revival of

treaties, prevents the application of any part of that article, because of the provision of the treaty of August 25, 1921 (art. 2, subdiv. 2), that the United States shall not be bound by any part of the Versailles treaty, relating to the League of Nations, nor by any action of the League unless expressly assented to. Possibly the ratification of the treaty containing the provision last referred to may imply an acceptance by this country of the services of the League to the extent indicated in article 289 of the Versailles treaty. If not, we see no difficulty in rejecting the clause of that article relating to the League of Nations while giving effect to the rest of it.

The judgment is reversed, with directions to render judgment for the defendants.