FLENSBURGER DAMPFERCOMPAGNIE v. UNITED STATES.

No. H–57.

Court of Claims.
Feb. 8, 1932.

This is a suit to recover $24,422 tonnage duties and taxes alleged to have been illegally collected under section 4229, Revised Statutes (46 USCA c. 5 note).

The case having been heard by the Court of Claims, the court, upon the evidence, makes the following special findings of fact:

1. The plaintiff is, and during the period in question here was, a corporation organized and existing under the laws of Prussia, Germany, and engaged in the business of operating steamships between Germany and other foreign ports for the transportation of freight for hire, and had its principal office and place of business in Flensburg, Germany.

The plaintiff, the Flensburger Dampfercompagnie, or its subsidiary, was the owner and/or charter owners of the following named steamships, all duly registered and documented under the laws of Germany as merchant vessels of Germany, to wit:

Hans, 968 tons.
Marie, 891 tons.
Alfred, 894 tons.
Septima, 823 tons.
Isolde, 966 tons.

Irmgard, 488 tons.

Christel Salling, 815 tons.

2. During the period from November 22, 1919, to October 18, 1921, the steamship Hans, having sailed from a German port, made eight separate voyages to the port of Galveston, Tex., and obtained entry as a German vessel upon each occasion.

The collector of customs at the said port, acting under the provisions of sections 4219 and 4225 of the Revised Statutes (46 USCA §§ 121, 128), imposed a tax and duty for each of the said voyages of $1 per ton on the net tonnage of the steamship Hans and compelled the plaintiff to pay on February 28, 1921, the sum of $4,840; on June 20, 1921, the sum of $968; on October 17, 1921, the sum of $968—making a total of $6,776.

3. During the period from March 12, 1920, to November 7, 1921, the steamship Marie, having sailed from a German port, made six separate voyages to the port of Galveston, Tex., and obtained entry as a German vessel upon each occasion.

The collector of customs at the said port, acting under the provisions of sections 4219 and 4225 of the Revised Statutes, imposed a tax and duty for each of the said voyages of $1 per ton on the net tonnage of the steamship Marie and compelled the plaintiff to pay, on December 29, 1920, sum of $891; on January 10, 1921, the sum of $1,782; on April 30, 1921, the sum of $891; on August 6, 1921, the sum of $891; on November 10, 1921, the sum of $891—making a total of $5,346.

4. During the period from May 6, 1920, to September 10, 1921, the steamship Alfred, having sailed from a German port, made five separate voyages to the port of Galveston, Tex., and obtained entry as a German vessel upon each occasion.

The collector of customs at the said port, acting under the provisions of sections 4219 and 4225 of the Revised Statutes, imposed a tax and duty for each of the said voyages of $1 per ton on the net tonnage of the steamship Alfred and compelled the plaintiff to pay on January 31, 1921, the sum of $2,682; on May 26, 1921, the sum of $894; on September 12, 1921, the sum of $894—making a total of $4,470.

5. During the period from June 30, 1920, to July 15, 1921, the steamship Septima, having sailed from a German port, made four separate voyages to the port of Galveston, Tex., and obtained entry as a German vessel upon each occasion.

The collector of customs at the said port, acting under the provisions of sections 4219 and 4225 of the Revised Statutes, imposed a tax and duty for each of the said voyages of $1 per ton on the net tonnage of the steamship Septima and compelled the plaintiff to pay on February 15, 1921, the sum of $2,469, and on July 16, 1921, the sum of $823, making a total of $3,292.

6. During the period from December 21, 1920, to March 30, 1921, the steamship Isolde having sailed from a German port, made two separate voyages to the port of Galveston, Tex., and obtained entry as a German vessel upon each occasion.

The collector of customs at the said port, acting under the provisions of sections 4219 and 4225 of the Revised Statutes, imposed a tax and duty for each of the said voyages of $1 per ton on the net tonnage of the steamship Isolde and compelled the plaintiff to pay on December 21, 1920, the sum of $966, and on March 30, 1921, the sum of $966, making a total of $1,932.

7. During the period from July 9, 1921, to November 9, 1921, the steamship Irmgard, having sailed from a German port, made two separate voyages to the port of Galveston, Tex., and obtained entry as a German vessel upon each occasion.

The collector of customs at the said port, acting under the provisions of sections 4219 and 4225 of the Revised Statutes, imposed a tax and duty for each of the said voyages of $1 per ton on the net tonnage of the steamship Irmgard and compelled the plaintiff to pay, on July 9, 1921, the sum of $488, and on November 12, 1921, the sum of $488, making a total of $976.

8. During the period from September 8, 1920, to February 3, 1921, the steamship Christel Salling, having sailed from a German port, made two separate voyages to the port of Galveston, Tex., and obtained entry as a German vessel upon each occasion.

The collector of customs at the said port, acting under the provisions of sections 4219 and 4225 of the Revised Statutes, imposed a tax and duty for each of the said voyages of $1 per ton on the net tonnage of the steamship Christel Salling and compelled the plaintiff to pay on February 3, 1921, the sum of $1,630.

9. During the period from July 14, 1919, to November 11, 1921, no higher taxes or duties were exacted in German ports from American vessels and their cargoes than from German ships and their cargoes—the tax of $1 per ton was not levied or collected in ports

of the United States on vessels registered under the laws of the United States as merchant vessels of the United States.

10. The government of Germany accords to citizens of the United States the right to prosecute claims for the refund of taxes and tonnage duties against such government in its courts.

11. No action has been had on this claim in Congress or by any of the departments, except to seek a refund from the Department of Commerce and the Secretary of State. The plaintiff is the sole owner of this claim and the only party interested therein and has made no assignment or transfer of the claim, or any part thereof, or interest therein.

Edwin M. Borchard, of New York City (Katz & Sommerich and Otto C. Sommerich, all of New York City, on the brief), for plaintiff.

W. Clifton Stone, of Washington, D. C., and Charles B. Rugg, Asst. Atty. Gen. (J. Frank Staley, of Washington, D. C., on the brief), for the United States.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, and WILLIAMS, Judges.

BOOTH, Chief Justice.

The plaintiff is a steamship corporation organized and existing under the laws of Prussia, Germany. Plaintiff operates steamships between Prussia, Germany, and other foreign countries, transporting cargoes for hire. Its principal place of business is Flensburg, Germany.

On the dates mentioned in the findings the steamships designated by the names therein set forth arrived in the various American ports described, and obtained entry as German vessels. The various collectors of customs at said ports imposed a tax and duty of $1 on each of said steamship's net tonnage, amounting in the aggregate to $24,422, which the plaintiff paid under protest, and for the recovery of which, with interest, this suit is brought.

The tonnage taxes collected by the government were so collected under the provisions of sections 4219 and 4225 of the Revised Statutes (46 USCA §§ 121, 128). Section 4219 is as follows: "Sec. 4219. * * * [Upon vessels which shall be entered in the United States from any foreign port or place there shall be paid duties as follows: On vessels built within the United States but belonging wholly or in part to subjects of foreign powers, at the rate of thirty cents per ton; on other vessels not of the United States, at the rate of fifty cents per ton. Upon every vessel not of the United States, which shall be entered in one district from another district, having on board goods, wares, or merchandise taken in one district to be delivered in another district, duties shall be paid at the rate of fifty cents per ton. Nothing in this section shall be deemed in any wise to impair any rights or privileges which have been or may be acquired by any foreign nation under the laws and treaties of the United States relative to the duty of tonnage on vessels. On all foreign vessels which shall be entered in the United States from any foreign port or place, to and with which vessels of the United States are not ordinarily permitted to enter and trade, there shall be paid a duty at the rate of two dollars per ton; and none of the duties on tonnage above mentioned shall be levied on the vessels of any foreign nation if the President of the United States shall be satisfied that the discriminating or countervailing duties of such foreign nations, so far as they operate to the disadvantage of the United States, have been abolished. In addition to the tonnage-duty above imposed, there shall be paid a tax, at the rate of thirty cents per ton, on vessels which shall be entered at any custom-house within the United States from any foreign port or place; and any rights or privileges acquired by any foreign nation under the laws and treaties of the United States relative to the duty of tonnage on vessels shall not be impaired; and any vessel any officer of which shall not be a citizen of the United States shall pay a tax of fifty cents per ton.]"

Section 4225 of the Revised Statutes reads as follows: "A duty of 50 cents per ton, to be denominated 'light money,' shall be levied and collected on all vessels not of the United States, which may enter the ports of the United States. Such light money shall be levied and collected in the same manner and under the same regulations as the tonnage duties."

The plaintiff's cause of action is predicated upon the provisions of sections 4227 and 4229 of the Revised Statutes and the treaty of 1828 between the United States and Prussia (8 Stat. 378). Section 4227, Revised Statutes, is as follows: "Sec. 4227. Nothing contained in this chapter shall be deemed in any wise to impair any rights and privileges which have been or may be acquired by any foreign nation under the laws and treaties of the United States relative to the duty on ton-

nage of vessels, or any other duty on vessels." (46 USCA § 135.)

Section 4229, Revised Statutes, is as follows: "Sec. 4229. No other or higher rate of duties shall be imposed or collected on vessels of Prussia, or of her dominions, from whencesoever coming, nor on their cargoes, howsoever composed, than are or may be payable on vessels of the United States, and their cargoes." (46 USCA c. 5 note.)

Section 4227, Revised Statutes, was enacted April 27, 1816, amended January 14, 1817, and July 14, 1862, and is the last paragraph of chapter 3, dealing with tonnage duties, of title 48, constituting the Regulations of Commerce and Navigation. (Revised Statutes, p. 814.)

Article 2 of the treaty of May 1, 1828, between the United States and Prussia, provides as follows: "Prussian vessels arriving either laden or in ballast, in the ports of the United States of America; and, reciprocally, vessels of the United States arriving either laden, or in ballast, in the ports of the kingdom of Prussia, shall be treated, on their entrance, during their stay, and at their departure, upon the same footing as national vessels, coming from the same place, with respect to the duties of tonnage, light-houses, pilotage, salvage, and port charges, as well as to the fees and perquisites of public officers, and all other duties and charges, of whatever kind or denomination, levied in the name, or to the profit, of the government, the local authorities, or of any private establishment whatsoever."

Section 4229, Revised Statutes (supra), is a re-enactment of section 2 of the act of May 24, 1828 (4 Stat. 308), and was obviously intended to carry into effect the above-cited article 2 of the treaty of May 1, 1828 (8 Stat. 378).

Section 4230, Revised Statutes (46 USCA c. 5 note), by the following provisions, viz.: "The preceding section shall continue and be in force during the time that the equality for which it provides shall, in all respects, be reciprocated in the ports of Prussia and her dominions; and if at any time hereafter the equality shall not be reciprocated in the ports of Prussia and her dominions, the President may issue his proclamation, declaring that fact, and thereupon the section preceding shall cease to be in force," clearly intends a method by which the termination of reciprocal relations by Prussia will accord the United States escape from the obligations of the statute.

The late war occasions this controversy. The tonnage taxes sought to be recovered were paid by the plaintiff under protest from November 22, 1919, to November 9, 1921, a period of time subsequent to the Armistice and antedating the effective date fixed by President Harding in his proclamation of March 22, 1922 (42 Stat. 2267), when prior reciprocal relations between Germany and the United States, in so far as discriminating tonnage duties are concerned, were effectively continued under section 4228, Revised Statutes (46 USCA § 141). There can be no doubt, we think, that the duties and taxes collected by the government under sections 4219 and 4225, in the absence of the provisions of sections 4227 and 4229 and article 2 of the Prussian treaty, were legally collected. It is the intervening rights accorded under the sections of the Revised Statutes and the treaty, expressly protected by congressional enactment, which must be held invalid if the Government is to prevail. Unquestionably, under sections 4219 and 4228 a foreign country might not escape the payment of the duties involved until satisfactory proof of reciprocal trade relations in this respect convinced the President of existing reciprocity and a proclamation suspending the operation of the statute followed, unless other provisions of law in pari materia and treaty stipulations operated to exempt the foreign nation irrespective of the President's proclamation. As to this court, section 153 of the Judicial Code (28 USCA § 259) precludes jurisdiction if the claim sued upon is dependent upon or arises out of treaty stipulations with any foreign country. The plaintiff to recover must establish a right under the statutes. We do not deem it necessary to indulge comment upon the numerous cases cited and the array of diplomatic correspondence referred to in the briefs of counsel respecting the construction and interpretation given by the government to article 2 of the Prussian treaty. We think that beyond peradventure the government has without exception recognized this article of the treaty as applicable to Germany subsequent to the formation of the North German Union in 1866 and the German Empire in 1871, and accorded reciprocity accordingly, extending the same to vessels of Prussia as vessels of Germany. The established principle of reciprocity between the two nations has continued, as observed in the plaintiff's brief, for more than a century, uniform except as to a brief period of time in 1896 as to the 6-cent duty under the act of 1886. The cita-

tions to sustain the point find no contradiction in the defendant's brief, and for reference we set them forth in a footnote.[1]

Down to the date of the entrance of the United States into the World War, when, of course, no commerce obtained, the reciprocity stipulations of the treaty of 1828 and the provisions of section 4229, R. S., were recognized by the United States as being applicable to steamships of Germany and no tonnage duties or taxes of the character here involved were levied or collected upon vessels of Germany. The only possible necessity for a discussion and adjudication by this court of the issue as to whether the war abrogated or suspended the stipulations contained in article 2 of the Prussian treaty of 1828, resides in the fact that section 4227 may give to the plaintiff a cause of action over which the court has jurisdiction, irrespective of the treaty. Obviously, if the war abrogated the treaty of 1828 section 4227 may not be invoked in plaintiff's behalf. The difficulty which the court encounters with respect to this particular contention vitally involves a jurisdictional question.

The verbiage of section 4227, R. S., cannot be said to give rise to a claim against the United States independent of a treaty. The legislation of which section 4227 is a part deals with tonnage duties and taxes independently of treaty stipulations. This is manifest, for section 4219, R. S., levying the duties, as well as section 4227, expressly exempts from its operation all treaty provisions with any foreign nation which establish a different order of commercial intercourse. Therefore, it seems clear that any claim coming within the purview of section 4227 necessarily arises out of and is dependent upon the treaty of 1828. United States v. Weld, 127 U. S. 51, 8 S. Ct. 1000, 32 L. Ed. 62. The court, in other words, must resort to the treaty of 1828 and not the statute to ascertain the relative rights of the parties litigant. All that section 4227 accomplishes is to save acquired treaty rights from its operation. An

existing unabrogated treaty is "the supreme law of the land."

The turning point of the case, as we view it, is confined to sections 4229 and 4230, R. S. Section 4229, as previously observed, is a re-enactment of the act of May 24, 1828, and was designed and intended to carry into effect article 2 of the treaty of 1828. Just why Congress deemed it essential and important to supplement article 2 with a statutory provision will appear, we think, and the section undoubtedly exempted Prussian vessels from the operation of section 4219 or any existing law to the contrary. A way of rendering section 4229 inoperative was provided in section 4230, and this record discloses that no action has ever been taken under section 4230, R. S. If, then, section 4229 was an existing valid act, in force during the period of time when the duties sued for were collected, they were exacted illegally. The government asserts that section 4229 was obsolete and had been since the formation of the German Empire in 1871; that both sections 4229 and 4230 were omitted from the United States Code of 1925; and that as a consequence of this situation there was but one way to escape the payment of the duties and taxes involved, and that was by presidential proclamation, as provided for in section 4228, R. S. It is not unusual, at least citations sustain the statement, for Congress to expressly enact legislation of the precise character upon which this suit depends. It may be precautionary in its essence and intended to forestall conflicts which might arise through inadvertence or mistake jeopardizing treaty rights.

In reference to the present controversy it is to be observed that section 4219, R. S., is one of general application, limited only by specific conditions without designating foreign nations by name, and hence Congress, we infer, deemed it important to provide as to Prussia, with whom a treaty upon the subject matter of the law had been concluded. It is incontrovertible that subsequent to 1871 vessels from Prussia, Germany, flying the German flag, documented and manned under article 54 of the German Constitution, entered the ports of the United States and were not subjected to tonnage duties or taxes as sued for in this case. We have no doubt that in keeping with the established and long-continued policy of the United States with respect to reciprocal commercial relations, in so far as tonnage duties and taxes are concerned, the government construed section 4229 as applicable to Prussian vessels from

---

[1] 12 Op. Attys. Gen. 463, 465; Bark Elwine Kreplin, 4 Ben. 422, Fed. Cas. No. 4427; For. Rel. 1883, p. 369; For. Rel. 1885, p. 404; For. Rel. 1885, p. 443; For. Rel. 1887, p. 370; Moore's Digest, vol. 5, p. 354; For. Rel. 1895, vol. 1, p. 539; 11 Am. Jour. Int. Law, p. 475; Treaty Collections of U. S., 1904; State of Kansas ex rel. Miner v. Reardon, 120 Kan. 614, 245 P. 158, 47 A. L. R. 452; Ex parte Newman, 14 Wall. 152, 20 L. Ed. 877; United States v. Diekelman, 92 U. S. 520, 530, 23 L. Ed. 742; North German Lloyd S. S. Co. v. Hedden (C. C.) 43 F. 17; Terlinden v. Ames, 184 U. S. 270, 22 S. Ct. 484, 46 L. Ed. 534; Disconto Gesellschaft v. Umbreit, 208 U. S. 570, 28 S. Ct. 337, 52 L. Ed. 625; United States v. M. H. Pulaski Co. 243 U. S. 97, 37 S. Ct. 346, 61 L. Ed. 617.

Prussia, Germany. This policy was at no time interrupted in so far as here pertinent except during the period extending from the outbreak of the World War and the resumption of trade relations with Germany subsequent to July 14, 1919, following which time it was again resumed as of November 11, 1919. It is extremely difficult to hold that a statute given the effect accorded to section 4229 by the executive officers of the government charged with its administration for so long a period of time, was so construed and administered contrary to law. To say the least, to so hold exacts most convincing and "cogent" reasons, and results in a situation where under treaty stipulations with Prussia her vessels have been accorded free entry as to tonnage duties and taxes in direct contravention of both the treaty and the statute. We say this for the treaty provided for the exemption and the statute did precisely the same thing independently of the treaty. The government contemplated no such result, and in keeping with the spirit and intent of both the treaty and the statute gave effect to its provisions notwithstanding a change in the political status of one of the contracting parties mentioned in both the treaty and the statute. Congress did not see fit to repeal section 4229 or resort to section 4230 during this period, and assuredly if it had become obsolete, as contended for, the nations involved would have been alert to bring the matter to the attention of their respective public authorities. Contemporaneous history confirms, we think, that both the governments of the United States and Germany were in accord in the belief that trade reciprocity, as in issue here, obtained and was conducted under and in virtue of both the treaty and the statute. There was no such change of sovereignty and status of subjects as in the cession by Spain to the United States of Puerto Rico and the Philippine Islands, or of the Virgin Islands by Denmark, or the acquisition by the United States of Hawaii. The rights previously secured by Prussia were treated and acknowledged as continuing under the régime of the German Empire, and vessels of Prussia were recognized as entitled to the exemption accorded them, without suggestion or intimation that a technical rule of construction forestalled the granted right under the statute. Reciprocity as to tonnage duties and taxes and provisions for its establishment and continuance are not essentially subject matters to be restricted to the letter of a law bringing it into existence, and we believe that where an ancient law extended it by express terms to a then existing segregated Kingdom, which later on became simply a constituent state of an Empire without in any way calculated to change the status or character of the same with respect to commercial intercourse between the two countries, the law granting the right must stand until superseded by later statutes or treaties upon the same subject.

From 1828 to July 14, 1919, Prussian vessels were exempted by the authorities of the United States, and it is conceded that subsequent to November 11, 1921, when the treaty of peace with Germany came into effect, reciprocity has continued. Therefore whatever of doubt may be engendered as to a defense now predicated upon the letter of section 4229, R. S., should be resolved in favor of its validity in conformity with a departmental construction of the act during this long period of time. We do not believe that it was the intention of the United States to revert to discriminatory duties of tonnage and taxes for the period from July 14, 1919, to November 11, 1921, for during this period the United States resumed trade relations, while at the same time considering the treaty between the United States and Germany proclaimed on November 11, 1921. We are not unmindful that what we hold is contrary to the very exhaustive and convincing opinion of the District Court in the Sophie Rickmers Case, 45 F.(2d) 413, 417. "Treaties," says the learned judge in the Rickmers Case, supra, "are consensual in their nature; the obligations of its predecessor are deemed to be accepted by the successor state. The statute, however, is not consensual; it merely expresses a rule of conduct for the Executive Department which should not be enlarged beyond its terms." We cannot escape the conclusion that in ascertaining the scope and intent of both the treaty and the statute, analogous rules of construction obtain, and that where it appears from both executive and judicial interpretations that a treaty similar in scope and intent to a statute upon the identical subject matter and speaking of the same parties has received the approval of validity, why the statute enacted to supplement it in language of like import granting the same legislative immunity does not come within the same category. If section 4227, R. S. (46 USCA § 135), is applicable to the instant case, it is difficult to perceive why section 4229 (46 USCA e. 5 note) is not also applicable, as the plaintiff contends.

The defendant insists that it is only by presidential proclamation under section 4228 that exemption from duties imposed by sec-

tion 4219, R. S., may be claimed. The defendant, we think, is in error in this regard, for from 1828 to November, 1919, at least, discriminating duties of tonnage were not levied or collected upon Prussian vessels, and no presidential proclamation exempted them.

On July 14, 1919, the War Trade Board section of the State Department, by Bulletin 802, announced the issuance of a general trade license for trade with Germany, as permitted by the trading with the enemy act, but the President did not formally declare the war at an end. Congress by its joint resolutions of March 3, 1921 (41 Stat. 1359), and July 2, 1921 (42 Stat. 105), declared the war at an end, and noted certain exceptions not pertinent here.

By an Executive order of March 22, 1922, the exemption rights in question here were extended to German vessels, in the manner provided by section 4228, R. S., and made effective from November 11, 1921.

The period of uncertain rights is from the date of the granting of the general trade license to the effective date of the President's Executive order of March 22, 1922, namely, from July 14, 1919, to November 11, 1921.

The treaty of Versailles had been submitted to the Senate July 10, 1919. Its provisions, if adopted, would have covered the questions at issue here, for under article 276 it was provided that:

"Germany undertakes:

"(a) Not to subject the nationals of the allied and associated powers to any prohibition in regard to the exercise of occupations, professions, trade and industry, which shall not be equally applicable to all aliens without exception;

"(b) Not to subject the nationals of the allied and associated powers in regard to the rights referred to in paragraph (a) to any regulation or restriction which might contravene directly or indirectly the stipulations of the said paragraph, or which shall be other or more disadvantageous than those which are applicable to nationals of the most favoured nation;

"(c) Not to subject the nationals of the allied and associated powers, their property, rights, or interests, including companies and associations in which they are interested, to any charge, tax or impost, direct or indirect, other or higher than those which are or may be imposed on her own nationals or their property, rights or interests;

"(d) Not to subject the nationals of any one of the allied and associated powers to any restriction which was not applicable on July 1, 1914, to the nationals of such powers unless such restriction is likewise imposed on her own nationals."

The protracted delay resulting from the consideration of the treaty of Versailles and the subsequent drafting of the substituted treaty proclaimed November 11, 1921, undoubtedly prompted the passage in the meantime of the joint resolutions of March 3, 1921, and July 2, 1921, in an effort to clarify an otherwise uncertain state of affairs. The President's exemption order issued under the authority of section 4228, R. S., has no independent significance; it followed directly upon the exchange of ratification of the treaty of peace of 1921 and, in effect, duplicated those provisions which were already incorporated in the latter treaty in article 2 and borrowed from the treaty of Versailles. Primarily, the exemption order was, we believe, merely declaratory of the rights of the German vessels for administrative purposes. The treaty provision in question is as follows:

"With a view to defining more particularly the obligations of Germany under the foregoing article with respect to certain provisions in the treaty of Versailles, it is understood and agreed between the high contracting parties:

"(1) That the rights and advantages stipulated in that treaty for the benefit of the United States, which it is intended the United States shall have and enjoy, are those defined in section 1, of Part IV, and Parts V, VI, VII, VIII, IX, X, XI, XII, XIV, and XV.

"The United States in availing itself of the rights and advantages stipulated in the provisions of that treaty mentioned in this paragraph will do so in a manner consistent with the rights accorded to Germany under such provisions."

Paraphrased, it was contemplated by the provisions of the treaty of Versailles (1919), and carried into and made effective in the treaty of peace (1921), that Germany should not subject American nationals to any prohibition, charge, or tax, or imposts other or higher than those which are or may be imposed on German nationals—in other words, that Germany should do that very thing which, if done, would make the provisions of section 4229, R. S., operative and permit the exemption in question.

The signing of the treaty of Versailles June 28, 1919, was followed by the issuance of the general trade license, July 14, 1919—under the terms of the treaty of peace with

Germany of 1921, the provision was made for the manner of the termination of the treaty of 1828 and its termination was effected six months later, after the date of the exchange of ratification of November 11, 1921, the date from which the President's exemption order of March 22, 1922, was made to apply.

The trade permitted after July 14, 1919, of necessity included, among other things, the entry of German vessels into American ports. The whole purpose of the general trade license, which the President had full authority to issue, was to make it possible to resume the former commercial dealings between the nationals of the two countries upon and in accord with existing treaties and laws.

It is true that sections 4229 and 4230, R. S., were not included in the U. S. Code of 1926, and from this fact defendant deduces an argument that their omission is due to the fact that they were obsolete. The argument is not convincing. The adoption of the Code did not serve to repeal a law, and, as observed by plaintiff in its brief, both sections were carried into the Revised Statutes of 1873 and 1878, "prepared two and eight years after the formation of the German Empire," and section 4227 is carried into the Code. In the preface to the Code the following statement appears: "No new law is enacted and no law repealed. It is prima facie the law. It is presumed to be the law. The presumption is rebuttable by production of prior unrepealed Acts of Congress at variance with the Code."

The rule has long obtained that where a department of the government charged with the administration of a statute has accorded it definite scope and effect uninterruptedly over a long period of time, courts look with disfavor upon giving it a contrary effect, in the absence of "cogent reasons" for so doing. United States v. Alabama Great Southern R. Co., 142 U. S. 615, 12 S. Ct. 306, 35 L. Ed. 1134; United States v. Tanner, 147 U. S. 661, 13 S. Ct. 436, 37 L. Ed. 321; United States v. Healey, 160 U. S. 136, 16 S. Ct. 247, 40 L. Ed. 369.

While a subsequent change of political status may operate to render ineffective a statutory provision in reference to the status quo existing on the date of its enactment, nevertheless it is obviously a delicate matter for a judicial tribunal to hold such a law invalid in the face of long-continued recognition of its validity as applicable to the changed conditions, and the failure of Congress to repeal the law involving important relations with a foreign government adds to the difficulty of so doing. The reciprocal trade relations established by the law continued and each nation involved recognized the legality of the procedure.

We think the plaintiff is entitled to recover. The case is not one, however, in which, under the law, interest may be added to the sum paid. Judgment for plaintiff in the sum of $24,422. It is so ordered.

WHALEY, Judge, took no part in the decision of this case, on account of illness.