# J. C. F. CHIRAC v. the Lessee of A. F. CHIRAC *et. al.*

J. B. C., a native of France, migrated into the United States in 1793, and became domiciled in Maryland. On the 22d September, 1795, he took the oaths of citizenship according to an act of Assembly of Maryland, passed in 1779, and the next day received a convey-

ance in fee of lands in that State. On the 6th July, 1798, he was naturalized under the laws of the United States; and, in July, 1799, died intestate, leaving no legitimate relations, other than the plaintiffs in ejectment, who were natives and residents of France. Upon the supposition that the lands were escheatable, the state of Maryland conveyed them to his natural son J. C. F. C., with a saving of the rights of all persons claiming by devise, or descent from the intestate; under which grant, J. C. F. C. took possession of the lands, and remained in possession until the ejectment was brought. In March, 1809, the defendants in error, the heirs at law of J. B. C., French subjects, brought an action of ejectment for the lands in question; and, in May 1815, obtained a verdict in their favour, and a judgment thereon, which was affirmed.

It was held, that the power of naturalization is exclusively in congress; but that the treaty of amity and commerce between the United States and France, of 1778, art. 11, enabled the subjects of France to purchase and hold lands in the United States.

Quære, What was the effect of this treaty under the Confederation?

J. B. C. having died, seized in fee of the lands in question; his heirs being French subjects; the treaty of 1778 having been abrogated and the act of Maryland, of 1789, permitting the lands of a French subject, who had become a citizen of Maryland, dying intestate, to descend on the next of kin being non-naturalized Frenchmen, with a proviso vesting the land in the State, if the French heirs should not, within ten years, become resident citizens of the State, or convey the lands to a citizen: it was determined, that the time for the performance of this condition having expired before the action was brought, the estate was terminated, unless supported in some other manner than by the act of Maryland.

But the convention of 1800, between the United States and France, enabling the people of one country holding lands in the other, to dispose of the same by testament, or otherwise, and to inherit lands in the respective countries without being obliged to obtain letters of naturalization; it was held that it rendered the performance of this condition a useless formality, and that the conventional rule applied equally to the case of those who took by descent, under the act, as to those who acquired by purchase, without its aid.

The further stipulation in the convention " that in case the laws of either of the two states should restrain strangers from the exercise of the rights of property with respect to real estate, such real estate may be sold, or otherwise disposed of, to citizens or inhabitants

of the country where it may be," was held not to affect the rights of a French subject who takes, or holds, by the convention, so as to deprive him of the power of selling to citizens of this country; and was held to give to a French subject, who had acquired lands by descent, or devise, (and, perhaps, in any other manner,) the right, during life, to sell, or otherwise dispose thereof, if lying in a state where lands purchased by an alien, generally, would be immediately escheatable.

Although the convention of 1800 has expired by its own limitation, it was determined that the instant the descent was cast on a French subject during its continuance, his rights became complete under it, and could not be affected by its subsequent expiration.

ERROR to the circuit court for the district of Maryland.

John Baptiste Chirac, a native of France, migrated into the United States, in the year 1793, and settled in Maryland. On the 22d of September, 1795, he took the oaths of citizenship, according to the form prescribed by an act of Assembly of the state of Maryland, passed in the year 1779, and the next day received a conveyance in fee of land lying within that state.

On the 6th of July, 1798, he was naturalized as prescribed by the laws of the United States; and, in July, 1799, he died intestate, leaving no legitimate relations other than the plaintiffs, who are natives and residents of France.

Supposing the lands of which he died seized to be escheatable, the state of Maryland conveyed them to John Charles Francis Chirac, his natural son, with a saving of the rights of all persons claiming by devise or descent from the intestate. Under this act, John Charles Francis Chirac took possession of the land of his father, and has remained in possession ever since.

In March, 1809, the defendants in error, who are the heirs at law of John Baptiste Chirac, and subjects of the king of France, brought their ejectment for the land of which their ancestor died seised; and in May, 1815, under the instruction of the court, to which exceptions were taken, obtained a verdict in their favour, on which a judgment was rendered; which judgment is now before the court on a writ of error.

The act of Assembly of the state of Maryland, on the construction of which the cause mainly turned, was passed in 1780, and is entitled "An act to declare and ascertain the privileges of the subjects of France residing within this state." The 1st section gives to French subjects the capacity of holding lands within the state, on certain conditions. The 2d section gives to those subjects who may be resident in the state, all the rights of free citizens thereof. The 3d section contains a proviso restricting and limiting the privileges granted by the act, and declaring that nothing therein contained "shall be construed to grant to those who shall continue subjects of his most christian majesty, and not qualify themselves as citizens of this state, any right to purchase or hold lands, or real estate, but for their respective lives, or for years." The 4th section enacts, that if any French subject who shall become a citizen of Maryland "shall die intestate, the natural kindred of such decedent, whether residing in France or elsewhere, shall inherit his or her real estate, in like manner as if such decedent, and his kindred, were the citizens of this state," with a proviso, that

whenever any French subject shall, by virtue of the act, become seised in fee of any real estate, his or her estate, " after the term of ten years be expired, shall vest in the state, unless the person seised of the same, shall, within that time, either come and settle in, and become a citizen of this state, or enfeoff thereof, some citizen of this or some other of the United States of America."

Mr. *Harper*, for the plaintiff in error, and the defendant in the court below. 1. The act of congress abrogating the French treaties, in consequence of the non-fulfilment of their stipulations by France, and the second article of the convention of 1800, stipulating for farther negotiation respecting the claims of the United States for indemnities, and respecting the revival of the treaties, drew after them a virtual repeal of the act of Maryland of 1780; that act being founded on the reciprocity stipulated by the treaties. The intervention of the local legislatures was deemed necessary to carry into effect treaties made by the national government under the confederation. The legislature of Maryland understood it to have been so, for their act is not a literal transcript of the treaty of 1778; it limits and controls the reciprocity stipulated by the treaty. As nobody at that period could conceive the possibility that we should ever cease to maintain the relations of friendship and alliance with France, no time for the duration of the act was limited; but when the treaty was annulled the act fell with it. Consequently, the heirs of John Baptiste Chirac had no

March 3d.

inheritable quality. 2. He acquired no capacity to hold by his naturalization under the local law, since, by the constitution, congress alone has the power of prescribing uniform rules of naturalization; and the act of Maryland is a general naturalization law, not a special act authorizing aliens to hold lands, or conferring other particular privileges. If the states could make such a law, the constitution of the United States would be completely evaded; as the citizens of one state are entitled to all the privileges and immunities of citizens in every other state. 3. The heirs of John Baptiste. Chirac have not conformed to the provisions of the act of Maryland by settling in the state and becoming citizens, *nor* by enfeoffing some person of the lands within ten years from the time when they became seised; and, consequently, their right was gone before the ejectment was brought. The term *seisin* in the act means, not a seisin in *fact*, a *pedis possessio*, but a legal seisin; and the ten years' limitation begins to run after the seisin in law. The technical word *enfeoff*, as here used, merely refers to the alienation of the land, which may be by bargain and sale, or any other usual mode of conveyance known in the state; and it was not necessary that they should come into the state in order to execute any of these conveyances, or even to make a feoffment.

Mr. *Winder* and Mr. *Mercer*, contra. 1. The constitution of the United States, and the laws made under it, do not, *ipso jure*, repeal a state law relative to the same matter, but only annul such parts of the latter as are inconsistent with the former. The re-

spective states still preserve the right of making naturalization laws, giving certain civil rights to foreigners, without conferring universal political citizenship. 2. The act of Maryland was not founded on the treaty merely; the legislature had other objects of policy in view than a mere compliance with the stipulations of the treaty; the continuance of the act was wholly independent of the treaty. It is a part of the code of Maryland, abstracted from the treaty, and would exist with or without the treaty. It consequently remained in full force and vigour notwithstanding the abrogation of the French treaties in 1798. The time of limitation contained in the act, within which the party is obliged to come and reside in the state, or to enfeoff a citizen, does not refer to a mere *seisin in law*. The term "seised," if unconnected with other expressions, qualifying its import, might, indeed, imply a *legal* seisin only; but with the injunction to "enfeoff," it necessarily imports a seisin in *fact*, because such a seisin is necessary to enable the party to make a feoffment. 4. But the convention of 1800, which was concluded whilst the defendant in error held an estate in fee simple under the act of Maryland, determinable by their failure to comply with one of the alternative conditions contained in that act, is conclusive of this cause. That convention enables the citizens of both countries to dispose by testament, donation, or otherwise, of their property, whether real or personal, situate in the territories of either, to *whomsoever they please;* and to succeed as heirs *ab intestato,*

1817.

Chirac
v.
Chirac.

without being naturalized.[a]    The first clause of the article gives a new power to dispose of property held by citizens of either country in the dominions of the other, viz. the power to dispose by *testament*, or *in any other manner*.    It, of course, repeals so much of the act of Maryland as restricts the power of disposing to the mode of feoffment only; and not only does not prescribe any period of time within which it is to be done, but necessarily gives the lifetime of the party, since it allows a disposition by last will and testament, which can only take effect after the death of the party.    The second clause places the citizens of both countries in the same predicament as to inheritances as if they were naturalized.    The defendants in error were, by the laws of the state, heirs to John Baptiste Chirac, subject to a liability to have their estate defeated unless they became naturalized.    This clause superceded the necessity of naturalization, or, rather, naturalized them for this particular purpose.    The further stipulation " that in case the laws of either of the two states should restrain strangers from the exercise of the rights of property with respect to real estate, such real estate may be sold, or otherwise disposed of, to citizens or inhabitants of the country where it may be," can only refer to the laws made by the two contracting parties, i. e. France and the *United States*; not any particular state of our domestic confederacy: for the states of the union, as separate and independent sovereignties are not included.

a *Art.* 7th.

No act of theirs could affect the convention. It is to them the supreme law; and no state law incompatible with it can be valid: therefore, that part of the act of Maryland which prescribes only one mode of disposing of real property belonging to Frenchmen, is void. The treaty secures the right to dispose of it in any mode.

Mr. *Martin*, in reply. 1. It is a general rule adopted by sovereign states, that the real property within their dominions should not be owned by aliens; not that this universal rule is considered as a deprival of property, the suffering a penalty, or the incurring of a forfeiture, but as an absolute disability to acquire, to hold, and to enjoy the property, founded upon reasons of public policy.[b] The act of Maryland merely dispenses with this rule to a certain extent, and upon certain conditions: it does not inflict any penalty or forfeiture on the kindred of the decedent; nor create in them any disabilities; nor deprive them of any property; nor infringe any of their rights whatsoever. Consequently, they must show that they have strictly complied with the terms on which this boon has been granted. 2. The moment the French subject, on whom the act confers a capacity to hold, dies, his kindred inherit; and the moment the kindred inherit, they become seised in fee; and the moment they become seised in fee, the time of limitation begins to run, within

---

[b] 1 *Bac. Abr. Alien. Letter c.* 132. ' *In Notis, Parker,* 144. 5 *Brown's Parl. Cas.* 91. The Attorney-General v. Duplessis.

which they must either come and settle in the state, &c., or enfeoff a citizen. The policy of the legislature in prescribing this limitation was, that not more than ten years should elapse from the decease of the French proprietor, before the lands should again be held and owned by a citizen, whose interest it might be to cultivate and improve the same for the benefit of the community. It was, therefore, perfectly immaterial by what technical mode of conveyance the property should be conveyed, and whether the seisin of the heirs should be a seisin in fact, or a legal seisin. The conveyance might be by *any sufficient deed;* and even a *feoffment* might be made by an attorney, without obtaining actual possession. 3. The stipulation in the convention of 1800 does not, of itself, g⁚ ⁝ to French citizens property which they had not before, nor enlarge or alter their estates in the lands held by them. They must have been legally entitled to property *when* the convention took place, or must have legally acquired it *afterwards.* The ancestor of the defendants in error had in his lifetime a fee simple, and died seised thereof; but of this estate he was seised, not as a French citizen, but as a citizen of Maryland; and upon his death his heirs, being aliens, could have had no legal claim to the property, and it would have escheated to the state, had it not been for the act of Maryland. Under that act they became seised of an estate in fee simple, but conditional and liable to be defeated, unless they complied with the terms of the act. Had they, within the ten years, become citizens of the state, they would not have wanted the protec-

tion of the treaty, for their property would have been protected as that of citizens. Had they, within the same time, enfeoffed a citizen, the estate would have vested in him, and the protection of the treaty would have been equally superfluous. As the heirs performed neither the one nor the other of these alternative conditions, their estate was defeated at the expiration of the term of ten years, and became vested in the state. From that time the defendants in error have not been seised of any estate to be operated on by the convention; and, consequently, it can give them no right to recover the lands either from the state, or from the plaintiff in error, who claims under the state.

Mr. Chief Justice MARSHALL delivered the opinion of the court.

The first point made by the plaintiff in error is, that the estate of which John Baptiste Chirac died seised was, in his lifetime, escheatable, because it was acquired before he became a citizen of the United States; the law of the state of Maryland, according to which he took the oaths of citizenship, being virtually repealed by the constitution of the United States, and the act of naturalization enacted by congress.

That the power of naturalization is exclusively in congress does not seem to be, and certainly ought not to be, controverted; but, it is contended, that the act of Maryland, passed in the year 1780, "To declare and ascertain the privileges of the subjects of France residing within that state," gives to those

subjects the power of holding land on the perform-
ance of certain conditions prescribed in that act.

The 2d section gives to the subjects of France
who may reside within the state of Maryland, all
the rights of free citizens of that state. The 3d
section contains a proviso restricting the privileges
granted by the act, and declaring that nothing there-
in contained shall be construed to grant to those
who should continue subjects of his most christian
majesty, and not qualify themselves as citizens of
this state, any right to purchase or hold lands, or
real estate, but for their respective lives or for
years.

This act certainly requires that a French subject,
who would entitle himself, under it, to hold lands in
fee, should be a citizen according to the law which
might be in force at the time of acquiring the estate.
Otherwise he could only purchase or hold for life or
years. John Baptiste Chirac was not a citizen ac-
cording to that law when he purchased the land in
controversy.

It is unnecessary to inquire into the consequences
of this state of things, because we are all of opinion
that the treaty between the United States and
France, ratified in 1778, enabled the subjects of
France to hold lands in the United States. That
treaty declared that " The subjects and inhabitants
of the United States, or any one of them, shall not
be reputed Aubains (that is *aliens*) in France."
" They may, by testament, donation, or otherwise,
dispose of their goods, moveable and immoveable, in
favour of such persons as to them shall seem good ;

and their heirs, subjects of the said United States, whether residing in France or elsewhere, may succeed them *ab intestat*, without being obliged to obtain letters of naturalization. The subjects of the most christian king shall enjoy, on their part, in all the dominions of the said states, an entire and perfect reciprocity relative to the stipulations contained in the present article.*[c]*"

Upon every principle of fair construction, this article gave to the subjects of France a right to purchase and hold lands in the United States.

It is unnecessary to inquire into the effect of this treaty under the confederation, because, before John Baptiste Chirac emigrated to the United States, the confederation had yielded to our present constitution, and this treaty had become the supreme law of the land.

---

[c] Before the French revolution the *droit d'aubaine* (*jus albinatus*) was abolished, or rather modified, by the treaties between France and the greater part of the other civilized powers of the world. But, it seems, according to an observation of M. *Tronchet*, in the discussions on the civil code, that this conventional law only excluded the royal fisc from taking by escheat the property of foreigners deceased in France, but did not exclude their French relations from inheriting, in preference to their foreign heirs in the same or a nearer degree of affinity; because the foreign heirs had not the *active* power of inheriting. This was given to all foreigners, without distinction, and, independent of treaties, by the national assembly in 1789. But this concession was repealed by the civil code, which again placed the matter upon its original footing of reciprocity, by enacting that foreigners should enjoy in France the same civil rights which are, or shall be, conceded to Frenchmen by the treaties with the nation to which such foreigners may belong. *Liv. 1. chap. 1, De la Jouissance des Droits Civils, Art. II. Discussions du Code Civil, par M. M. Jouanneau, &c. Tom. 1. p. 45.*

The repeal of this treaty could not affect the real estate acquired by John Baptiste Chirac, because he was then a naturalized citizen, conformably to the act of congress; and no longer required the protection given by treaty.

John Baptiste Chirac having died seised in fee of the land in controversy; his heirs at law being subjects of France; and there being, at that time, no treaty in existence between the two nations: did his land pass to these heirs, or did it become escheatable?

This question depends on the law of Maryland. The 4th section of the act already mentioned enacts, among other things, that if any subject of France who shall become a citizen of Maryland, " shall die intestate, the natural kindred of such decedent, whether residing in France or elsewhere, shall inherit his or her real estate, in like manner as if such decedent, and his kindred, were the citizens of this state."

An attempt has been made to avoid the effect of this claim in the act, by contending that it was passed for the sole purpose of enforcing the treaty, and was repealed by implication when the treaty was repealed.

The court does not think so. The enactment of the law is positive, and in its terms perpetual. Its provisions are not made dependent on the treaty; and, although the peculiar state of things then existing might constitute the principal motive for the law, the act remains in force from its words, however that state of things may change.

But, to this enacting clause is attached a proviso

that whenever any subject of France shall, by virtue of this act, become seised in fee of any real estate, his or her estate, " after the term of ten years be expired, shall vest in the state, unless the person seised of the same shall, within that time, either come and settle in, and become a citizen of this state, or enfeoff thereof some citizen of this or some other of the United States of America."

The heirs of John Baptiste Chirac then, on his death, became seised of his real estate in fee, liable to be defeated by the non-performance of the condition in the proviso above recited. The time given by the act for the performance of this condition expired in July, 1809, four months after the institution of this suit. It is admitted, that the condition has not been performed; but it is contended, that the non-performance is excused, because the heirs have been prevented from performing it by the act of law and of the party. The defendant, in the court below, has kept the heirs out of possession, under the act of the state of Maryland, so that they have been incapable of enfeoffing any American citizen; and, having been thus prevented from performing one condition, they are excused for not performing the other.

Whatever weight might be allowed to this argument, were it founded in fact, its effect cannot be admitted in this case. The heirs were not disabled from enfeoffing an American citizen. They might have entered, and have executed a conveyance for the land. Having failed to do so, their estate has terminated,

unless it be supported in some other manner than by the act of Maryland.

This brings the court to a material question in the cause. While the defendants in error were seised of an estate in fee simple, determinable by their failure to perform the condition contained in the act of 1780, another treaty was entered into between the United States and France, which provides for the rights of French subjects claiming lands by inheritance in the United States. This treaty enables the people of one country, holding lands in the other, to dispose of the same by testament or otherwise, as they shall think proper. It also enables them to inherit lands in the respective countries, without being obliged to obtain letters of naturalization.

Had John Baptiste Chirac, the person from whom the land in controversy descended, lived till this treaty became the law of the land, all will admit that the provisions which have been stated would, if unrestrained by other limitations, have vested the estate of which he died seised in his heirs.

If no act had been passed on the subject, and the appellees had purchased lands lying in the United States, it is equally clear that the stipulations referred to would have operated on these lands, so as to do away that liability to forfeiture to which the real estates of aliens are exposed.

Has it the same or any effect on the estate of which the appellees were seized when it was entered into?

It has been argued that the treaty protects exist-

ing estates, and gives to French subjects a capacity to dispose and to inherit; but does not enlarge estates.

This is true. But the estate of the defendants in error requires no enlargement. It is already a fee, although subject to be defeated by the non-performance of a condition. The question is, does this treaty dispense with the condition, or give a longer time for its performance? The condition is, that those who hold the estate shall become citizens of the United States, or shall enfeoff a citizen within ten years. Does the treaty control or dispense with this condition?

The direct object of this stipulation is, to give French subjects the rights of citizens, so far as respects property, and to dispense with the necessity of obtaining letters of naturalization. It does away the incapacity of alienage, and places the defendants in error in precisely the same situation, with respect to lands, as if they had become citizens. It renders the performance of the condition a useless formality, and seems to the court to release the rights of the state as entirely in this case as in the case of one who had purchased, instead of taking by descent. The act of Maryland has no particular reference to the case of Chirac, but is a general rule of state policy prescribing the terms on which French subjects may take and hold lands. This rule is changed by the treaty; and it seems to the court that the new rule applies to all cases, as well to those where the lands have descended by virtue of the act, as to those where lands have been ac-

quired without its aid. The general power to dispose " without limitation," which is given by the treaty, controls the particular power to enfeoff within ten years, which is given by the act of Maryland.

But the treaty proceeds to stipulate, " that in case the laws of either of the two states should restrain strangers from the exercise of the rights of property with respect to real estate, such real estate may be sold, or otherwise disposed of, to citizens or inhabitants of the country where it may be."

In many of the states, perhaps in all of them, the laws do " restrain strangers from the exercise of the rights of property with respect to real estate :" consequently, this provision limits, to a certain extent, the principles antecedently granted. What is the extent of this limitation ?

It will probably prevent a French subject from inheriting or purchasing the estate of a French subject, who is not also a citizen of the United States ; but it cannot affect the right of him who takes or holds by virtue of the treaty, so as to deprive him of the power to do that for which this clause stipulates ; that is, " to sell or otherwise dispose of the property to citizens or inhabitants of this country." This general power to sell, according to the principles of our law, and, it is presumed, of that of France, endures for life. A subject of France, then, who had acquired lands by descent or devise, (perhaps also by any other mode of purchase,) from a citizen of the United States, would have a right, during life, to sell or otherwise dispose of those lands, if lying in a state where lands purchased by an alien generally would

be immediately escheatable on account of alienage. The court can perceive no reason for restraining this construction in the application of the treaty to the state of Maryland, where the law, instead of subjecting the estate to immediate forfeiture, protects it for ten years. The treaty substitutes the term of life for the term of ten years given by the act.

If, then, the treaty between the United States and France still continued in force, the defendant would certainly be entitled to recover the land for which this suit is instituted. But the treaty is, by an article which has been added to it, limited to eight years, which have long since expired. How does this circumstance affect the case?

The treaty was framed with a view to its being perpetual. Consequently, its language is adapted to the state of things contemplated by the parties, and no provision could be made for the event of its expiring within a certain number of years. The court must decide on the effect of this added article in the case which has occurred. It will be admitted, that a right once vested does not require, for its preservation, the continued existence of the power by which it was acquired. If a treaty, or any other law, has performed its office by giving a right, the expiration of the treaty or law cannot extinguish that right. Let us, then, inquire, whether this temporary treaty gave rights which existed only for eight years, or gave rights during eight years which survived it.

The terms of this instrument leave no doubt on this subject. Its whole effect is immediate. The instant

the descent is cast, the right of the party becomes as complete as it can afterwards be made. The French subject who acquired lands by descent the day before its expiration, has precisely the same rights under it as he who acquired them the day after its formation. He is seised of the same estate, and has precisely the same power during life to dispose of it. This limitation of the compact between the two nations, would act upon, and change all its stipulations, if it could affect this case. But the court is of opinion, that the treaty had its full effect the instant a right was acquired under it; that it had nothing further to perform; and that its expiration or continuance afterwards was unimportant.

*Judgment affirmed.*