45 F.2d 413 (1930)
THE SOPHIE RICKMERS.
RICKMERS RHEDEREI AKTIENGESELLSCHAFT
v.
UNITED STATES.
District Court, S. D. New York.
July 17, 1930.
*414 Burlingham, Veeder, Fearey, Clark & Hupper, of New York City, for plaintiff.
Charles H. Tuttle, U. S. Atty., of New York City (Samuel C. Coleman, of New York City, of counsel), for the United States.
MACK, Circuit Judge.
The Sophie Rickmers, flying the German flag, and registered at Hamburg, entered the port of New York on September 27, 1921, on a voyage from Chaparra. She was owned by the plaintiff, a German corporation with its principal place of business at Hamburg. As a condition of entry, the collector of customs at the port imposed upon the vessel and collected a tonnage duty of 50 cents per ton, claiming to act under Rev. St. § 4219 as amended by the Act of Feb. 27, 1877, 19 Stat. 250 (46 U. S. Code, § 121 [46 USCA § 121]) and section 4225 (46 U. S. Code § 128 [46 USCA § 128]) set out in the margin.[1] *415 A tax of 6 cents per ton was also imposed and collected under section 36 of the Act of August 5, 1909, 36 Stat. 111 (46 U. S. Code § 121 [46 USCA § 121]). The plaintiff does not contest the validity of the 6-cent tax. It filed a petition, however, under the Tucker Act (28 U. S. Code § 41(20) [28 USCA § 41 (20)]), for the recovery of the duties paid under section 4219 and section 4225. It is the contention of the plaintiff that the portions of section 4219 and section 4225 which are relevant to the tax in suit have been repealed by subsequent legislation; that even if these sections are still in force, the Sophie Rickmers comes under the exemption provided by Rev. St. section 4229 and section 4230 and/or the Act of January 7, 1824 (4 Stat. 2), and that in any event, the Hanseatic Convention of 1827 and the treaty of 1828 with Prussia free it from these duties. The government moved to dismiss the petition for failure to state facts sufficient to constitute a cause of action.
While, in the light of the conclusion I have reached with regard to the treaties involved, it would be unnecessary to determine the other contentions, I deem it nevertheless proper, lest I may be found to have erred in that conclusion, to express my views thereon.
1. There has been some difference of opinion among officers of the Executive Department as to the present status of sections 4219 and 4225. The solicitor of the Department of Commerce was of the opinion that the 50-cent tax in question was abrogated by section 36 of the Payne-Aldrich Tariff Act of August 5, 1909, 36 Stat. 111; the Bureau of Navigation and the Attorney General, on the other hand, were of the contrary opinion. 33 Op. Attys. Gen. 174 (1922); 34 Op. Attys. Gen. 577 (1925).
Section 4219, as amended by Act of February 27, 1877 (19 Stat. 250), provides in its first part for a duty of 50 cents per ton on foreign vessels and 30 cents per ton on foreign vessels built in the United States. The second part of the section provides that "in addition to the tonnage-duty above imposed" a tax of 30 cents per ton should be paid on all vessels entered from any foreign port. Each part contains a proviso saving rights or privileges acquired by any foreign nation under the laws and treaties of the United States relative to the duty of tonnage on vessels.
The first part of the section is frankly discriminatory; the second part, on the other hand, embraces all vessels from foreign ports, including vessels flying our own flag. This distinction must be kept in mind in tracing the subsequent course of tonnage duty legislation.
Section 4219 was amended by section 14 of the Shipping Act of June 26, 1884 (23 Stat. 57) as set out in the margin.[2]
The duty imposed is stated to be "in lieu of the tax on tonnage of thirty cents per ton per annum heretofore imposed by law." Section 4219 refers to two taxes of 30 cents, the one in the first part relating to foreign vessels built in the United States, the other relating *416 to the blanket tax imposed on all vessels from foreign ports. The amendment creates a classification which fails to differentiate between American and foreign vessels, but depends rather upon the port from which the vessel comes. In its adoption of this test, the amendment becomes obviously referable to the second part of section 4219. The discriminatory provisions of the first part of that section remain unaffected, because the amendment deals with a different subject matter. Nor are the duty and the tax inconsistent for section 4219 in terms provided for their coexistence.
This conclusion is strengthened by a consideration of the language employed by Congress. The duties imposed by the Act of 1884 were "in lieu of the tax on tonnage." The first part of section 4219 imposed certain duties. The last paragraph of the section reads: "In addition to the tonnage duty above imposed, there shall be paid a tax, at the rate of thirty cents per ton." The amendment of 1884, therefore, seems to be a substitution for that portion of section 4219 designated as "tax."
Section 14 of the Act of 1884 was amended by section 11 of the Shipping Act of June 19, 1886 (24 Stat. 81). That amendment extended the nearby region from the ports of which a lower duty was charged. The reciprocity provision was extended as follows:
"Provided, That the President of the United States shall suspend the collection of so much of the duty herein imposed, on vessels entered from any foreign port, as may be in excess of the tonnage and light-house dues, or other equivalent tax or taxes, imposed in said port on American vessels by the Government of the foreign country in which such port is situated, and shall, upon the passage of this act, and from time to time thereafter as often as it may become necessary by reason of changes in the laws of the foreign countries above mentioned, indicate by proclamation the ports to which such suspension shall apply, and the rate or rates of tonnage-duty, if any, to be collected under such suspension."
This went beyond the reciprocity provision in the Act of 1884 which applied only to vessels entered from nearby countries.
Another change, and this is the one relied on by plaintiff, was effected by section 36 of the Payne-Aldrich Tariff Act of August 5, 1909 (36 Stat. 111) (46 U. S. Code § 121 [46 USCA § 121 and note]). That section provides as follows:
"Sec. 36. That a tonnage duty of two cents per ton, not to exceed in the aggregate ten cents per ton in any one year, is hereby imposed at each entry on all vessels which shall be entered in any port of the United States from any foreign port or place in North America, Central America, the West India Islands, the Bahama Islands, the Bermuda Islands, or the coast of South America bordering on the Caribbean Sea, or Newfoundland, and a duty of six cents per ton, not to exceed thirty cents per ton per annum, is hereby imposed at each entry on all vessels which shall be entered in any port, * * * not, however, to include vessels in distress or not engaged in trade. * * *
"Section forty-two hundred and thirty-two of the Revised Statutes, and sections eleven and twelve of chapter four hundred and twenty-one of the laws of eighteen hundred and eighty-six, approved June 19, 1886, and so much of section forty-two hundred and nineteen of the Revised Statutes as conflicts with this section, are hereby repealed."
The motive for the inclusion of section 36 of the Payne-Aldrich Tariff Act seems to have been a desire to abolish reciprocity. It was found that the then existing provisions for reciprocity reduced the revenue without affording a commensurate gain to American shipping abroad, because our merchant marine was small in comparison with the commercial fleets of the other maritime countries. See 44 Cong. Rec., 61st Cong., 1st Sess., pp. 4158-4161. Two reasons, therefore, lead to the conclusion that section 36 of the Act of 1909 did not supersede the first part of section 4219 of the Revised Statutes. First, it adopts with some changes the geographical distinction between nearby ports and others, announced in the Acts of 1884 and 1886, and applied to all vessels irrespective of nationality of ownership. Second, its elimination of reciprocity makes it complementary to rather than inconsistent with the discriminatory provisions of section 4219 and section 4225.
It is argued that the absence of the words "in lieu" in the 1909 Act distinguishes it from the Acts of 1884 and 1886, and indicates a complete substitution for the 30 and 50 cent tonnage duties of section 4219. The comparison of subject-matter hereinabove discussed disposes, in my judgment, of that contention. The Act of 1886 had already superseded the last part of section 4219 as amended by the Act of 1884. The specific repeal of section 11 of the Act of 1886 provided for in section 36 of the Act of 1909 indicates *417 sufficiently the type of tax sought to be affected. To have restated it in terms of a tax "in lieu" of the 30-cent tax of the last paragraph of section 4219 would have been supererogation. I am therefore of the opinion that the first two paragraphs of section 4219 and of section 4225, which concededly stands or falls with it, are in full force.
2. In addition to the Treaties of 1824 and 1828, hereinafter considered, plaintiff urges in support of the petition sections 4229 and 4230 of the Revised Statutes (46 USCA ch. 5 note). These sections were derived from sections 2-4 of the Act of May 24, 1828 (4 Stat. 308, c. 111), and provided that no higher rate of duties should be imposed on "vessels of Prussia" than were payable on vessels of the United States. The section was to continue in force "during the time that the equality for which it provides shall, in all respects, be reciprocated in the ports of Prussia and her dominions; and if at any time hereafter the equality shall not be reciprocated in the ports of Prussia and her dominions, the President may issue his proclamation, declaring that fact, and thereupon the section preceding shall cease to be in force."
In my judgment, the compilers of the Code properly omitted these sections from the body of existing law. It is unnecessary to decide whether war, in abrogating or suspending a treaty, can at the same time repeal legislation enacted as an expression of the same general policy as the treaty. Cf. Chirac v. Chirac, 15 U. S. (2 Wheat.) 259, 4 L. Ed. 234. The statute itself was no longer in force at the declaration of war, for it had ceased to have meaning after the formation of the German Empire. It refers specifically to "Prussian" vessels; its requirement of reciprocity could no longer be met by the Prussian government. The German merchant marine is a unit. Const. of Ger. Empire art. 54; Const. of German Republic (1919) art. 81. There are no ships of commerce that can be denominated Prussian. The cases which have held that treaties with Prussia survived the formation of the Empire do not affect the construction of a statute. Treaties are consensual in their nature; the obligations of its predecessor are deemed to be accepted by the successor state. The statute, however, is not consensual; it merely expresses a rule of conduct for the Executive Department which should not be enlarged beyond its terms. The reciprocity accorded to the vessels of the German Empire since 1871 does not depend upon the statute, for it had rights under the treaties until our entrance into the war. The proclamation by the President on January 26, 1888, suspending the collection of tonnage and lighthouse dues on vessels from the ports of Germany, was made in pursuance to the Act of June 19, 1886. See U. S. For. Rel. 1888, I, 669, 671; 5 Moore's Digest 295; North German Lloyd S. S. Co. v. Hedden (C. C.) 43 F. 17. It did not depend upon the act of May 24, 1828.
Nor, in my judgment, can rights be claimed under the Act of 1824 in respect to the vessel as "truly and wholly belonging to * * * subjects or citizens of Prussia" or "subjects or citizens of * * * Hamburg." For aught that appears in the petition, the owners of the vessel may be citizens of a state included within the Reich, other than Prussia or Hamburg. Furthermore, whatever the internal situation may be, they are, as to this country, citizens of the German Reich. In foreign relations we treat with the Reich itself and not with its parts. This statute, however, like Rev. St. §§ 4229 and 4230 (46 USCA ch. 5 note) cannot be enlarged beyond its terms to include the whole of Germany; to hold it still in force as to some of the constituent states of the German Reich while clearly not applicable to others, would be in my judgment, contrary to the spirit of the legislation.
3. The Convention of Friendship, Commerce and Navigation of 1827 between the United States and the Free Hanseatic Cities of Lubeck, Bremen, and Hamburg provides in article I as follows:
"* * * That no higher or other duties upon the tonnage or cargo of the vessel, shall be levied or collected, whether the importation be made in vessels of the United States, or of either of the said Hanseatic Republics. * * * Nor shall higher, or other charges of any kind, be imposed in the ports of the one party, on vessels of the other, than are, or shall be, payable in the same ports by national vessels." 1 Malloy, Treaties 901 (8 Stat. 366).
The Treaty of Commerce and Navigation of 1828 with the King of Prussia provides in article 2 as follows:
"Prussian vessels arriving either laden or in ballast, in the ports of the United States of America; and, reciprocally, vessels of the United States arriving either laden, or in ballast, in the ports of the kingdom of Prussia, shall be treated, on their entrance, during their stay, and at their departure, upon the same footing as national vessels, coming *418 from the same place, with respect to the duties of tonnage, light-houses, pilotage, salvage, and port charges, as well as to the fees and perquisites of public officers, and all other duties and charges, of whatever kind or denomination, levied in the name, or to the profit, of the government, the local authorities, or of any private establishment whatsoever." 2 Malloy, 1496.
It is settled that a later statute, though inconsistent with an earlier treaty, governs (Fong Yue Ting v. U. S., 149 U. S. 698, 13 S. Ct. 1016, 37 L. Ed. 905); but R. S. sections 4219 and 4227 expressly provide against the impairment of treaty rights relative to tonnage duties.
Trade relations with Germany were resumed after the war on July 14, 1919. See War Trade Board Regulation No. 802. The Treaty of Peace with Germany came into effect on November 11, 1921. 42 Stat. 1939. By its terms, incorporating part 10 of the Treaty of Versailles (art. 289), treaties which have not been revived are deemed to have lapsed. There has apparently been no revival of the Hanseatic Convention of 1827 or the Prussian treaty of 1828. See a letter from the Department of State quoted in Goos v. Brocks, 117 Neb. 750, 223 N. W. 13, 15. The provisions of the Treaty of Peace do not conclusively establish, however, the time from which their abrogation is to date. See State v. Reardon, 120 Kan. 614, 245 P. 158, 47 A. L. R. 452.
The situation at the present time is governed by the Treaty of December 8, 1923, between the United States and Germany, which provides in article IX for equality as to tonnage duties with national vessels of the other contracting party. 44 Stat. 2132. That treaty, of course, has no application to duties levied prior to its ratification. Nor has the Presidential Proclamation of March 22, 1922 (42 Stat. 2267), proclaiming "that the foreign discriminating duties of tonnage and imposts within the United States are suspended and discontinued as far as respects the vessels of Germany," any effect prior to November 11, 1921, the date provided for the commencement of the suspension. The question now under consideration is narrowed, then, to whether or not the pre-war treaties continued in force between July 14, 1919, and November 11, 1921, the duties in question having been imposed during that period.
Until the commencement of the war with Germany, the treaties were clearly in force. Treaties with sovereign states, which became constituent parts of the German Empire, survived the formation of the Empire. Terlinden v. Ames, 184 U. S. 270, 285, 22 S. Ct. 484, 46 L. Ed. 534; The Disconto Gesellschaft v. Umbreit, 208 U. S. 571, 581, 28 S. Ct. 337, 52 L. Ed. 625. Upon this assumption, the government refrained from entering into new commercial conventions. See Reeves, The Prussian-American Treaties, 11 Am. Jour. Int. L. 475. The Treaty of 1828, particularly has been recognized by both governments, since 1871, as in force.[3]
The effect of war upon treaty obligations has been the subject of learned judicial discussion in recent years. Karnuth v. United States, 279 U. S. 231, 49 S. Ct. 274, 73 L. Ed. 677; Techt v. Hughes, 229 N. Y. 222, 128 N. E. 185, 11 A. L. R. 166, certiorari denied 254 U. S. 643, 41 S. Ct. 14, 65 L. Ed. 454; State v. Reardon, supra; Goos v. Brocks, supra. While great weight will be given to the construction of a treaty by the Executive Department if and when made, the question itself is judicial in its nature. Cf. Sullivan v. Kidd, 254 U. S. 433, 442, 41 S. Ct. 158, 65 L. Ed. 344. The present attitude of the government, as manifested in the Treaty of 1923, previously referred to, casts no light on the attitude of the Department of State in 1921. Indeed, that department has indicated that it took no position with regard to the issue here raised. See 40 Harvard Law Review, 756, note. The problem is, then, one for the courts, without aid from the Executive interpretation.
A state of war does not, of necessity, destroy obligations which rest upon international compact. It was formerly thought by some that such would invariably be its effect (3 Phillimore, International Law 793, 2 Fauchille, Traite de droit international [1921] 54), but the modern view refuses to treat all international agreements as nullified by hostilities. 5 Moore's Digest of International Law 383; Fiore, International Law Codified (Borchard's Trans.) § 1483. Two schools of thought may be said to have developed. Some writers believe that treaties are generally annulled by war, subject to certain exceptions; *419 others assert that abrogation is the exception and survival the general rule. Fiore, supra; Funck-Brentano et Sorel, Precis du droit des gens, 247. As to certain classes of treaties, there is no disagreement. Thus, political treaties are generally regarded as annulled by war. Dispositive treaties, on the other hand, which create rights of a permanent nature, are deemed to survive. Society for the Propagation of the Gospel v. New Haven, 21 U. S. (8 Wheat.) 464, 5 L. Ed. 662; 1 Westlake, International Law (1904), 60; Crandall, Treaties, 443. Treaties of amity and commerce lie in the borderland of controversy. Hall, for example, states that such treaties are nullified by the status of belligerency. Hall, International Law, 404; 2 Hyde, International Law, § 550; 2 Fauchille, supra, 55; Wheaton, International Law (5th Ed.) 377. Fiore and Calvo, on the other hand, seem to favor their survival. Fiore, supra; Calvo, le droit international (3d Ed.) §§ 1687 and 2961; see also Lawrence, Principles of Int. Law, 313; authorities cited in Fauchille, 55, note. Other writers believe that commercial treaties are either merely suspended or entirely annulled at the option of either of the belligerents. Phillipson, Termination of War and Treaties of Peace, 264; 2 Oppenhein, International Law, 203.
The rule of law cannot be said to be absolute. The primary function of the judge is to recognize that there are few precepts for his guidance. As was well said by Judge Cardozo:
"When I ask what that principle or standard is, and endeavor to extract it from the long chapters in the books, I get this, and nothing more: That provisions compatible with a state of hostilities, unless expressly terminated, will be enforced, and those incompatible rejected." Techt v. Hughes, 229 N. Y. at page 241, 128 N. E. 185, 191, 11 A. L. R. 166.
The test suggested is, of necessity, general in its language. The difficulty of a formula lies in its application to particulars. The construction of a definite treaty is too often unenlightened by judicial precedent, for war, happily, is of rare occurrence. The criteria of judgment must then be pragmatic. Often, indeed, the sanction of practice will remedy the deficiency of precedent, but the practice of states on the question is not entirely conclusive.
While, as Hyde says, arrangements concerning former treaties have not implied a recognition of their survival by operation of law, but simply an acknowledgment of the value of their provisions as a basis for fresh covenants" (2 Hyde, International Law, 95), and while in treaties of peace it has at times been assumed that commercial conventions had been annulled, other treaties of peace have remained silent as to the effect of the war upon prior treaties, the parties merely providing for a continuation of the former conventions.[4] But even express stipulations for revival are at best equivocal, for they may have been inserted out of an abundance of caution. The rule of international law being unexpressed, it is the province of statesmen to anticipate ambiguity by resolving it in words. It may be granted that in the light of modern practice a failure to provide for the effect of a past war is not to be expected. Yet there must ordinarily be a period of time from the cessation of hostilities or from the permitted resumption of commercial dealings to the ratification of the treaty of peace during which the provisions of the latter cannot govern. Such parts of treaties of commerce as affect at least the transportation of goods should, in my judgment, be so interpreted, if reasonably possible, as again to bring about for that time the status which prevailed before the war. The resumption of trade relations marks a resumption of the ways of peace. The processes of law, at least in the absence of a contrary determination by the executive branch of the government, should favor rather than retard the early restoration of pre-war conditions. A course of commercial conduct which has controlled the everyday relations between states for many years might well be deemed the normal concomitant of those relations. This view is supported by the fact that treaties of peace often provide for "most favored nation" treatment (Crandall, supra, 452), indicating a complete willingness to repair the breach. The war is, as has been aptly said, "an interlude of savage life," and its rigors ought not to be unduly prolonged by judicial construction. As Fiore says:
"War does not place the combatants in the status of the so-called `state of nature' and does not destroy the authority of international and conventional law so far as they are concerned * * * legal rights and obligations based upon previous treaties recover their value when war has ceased, unless *420 the treaty of peace shall otherwise provide." Fiore, International Law Codified (Borchard's Trans. 1918) § 1438.
The criterion is at best merely one of presumption. The intention of the parties must be determined from the surrounding circumstances. The question must be looked at in the light of the history of our commercial policy.
The fourth treaty of commerce to be entered into by the United States was concluded with Prussia in 1785. It provided for conditional most favored nation treatment. This was followed, on its expiration, by the Treaty of 1799 which was similar in its terms. After an interlude of ten years during which no treaty was in force, the treaty of 1828 was signed. Other treaties of commerce and navigation were later concluded with other German states, Hanover in 1840, and Mecklenburg-Schwerin in 1847.
These latter treaties were entered into pursuant to a continuance of the American policy of encouraging reciprocity. (See Remarks of Senator Woodbury on February 6th, 1828, 4 Cong. Debates, pt. 1, 237-40.) That policy was enunciated by the Act of March 3, 1815 (3 Stat. 224, c. 77), and was carried into effect as to vessels of Hamburg by the Proclamation of August 1, 1818 (3 Stat. Append. 793). Reciprocity was extended to various countries by the Act of January 7, 1824 (4 Stat. 2, c. 4), and was made to embrace all countries by the Act of May 24, 1828 (4 Stat. 308, c. 111), the President having been given power to suspend discriminatory duties on vessels of countries which did not impose such duties on our vessels. This act in sections 2 and 4 specifically granted exemptions to Prussian vessels. No presidential proclamation was necessary to carry these sections into effect.
By the Act of May 31, 1830 (4 Stat. 425, c. 219, § 2), tonnage duties were practically abolished. This state of affairs continued until the Act of July 14, 1862 (12 Stat. 558, c. 163, § 15), which imposed on all vessels a 10-cent tax. This tax was not discriminatory and was designed to raise revenue to meet the expenses of the Civil War. (See Report of House Comm. on Foreign Affairs, Mar. 29th, 1878, Report 124, pt. 2, 45th Cong. 2d Sess., vol. 1.) Minor changes followed in 1865 and 1867. The two 50-cent taxes in question were provided for in sections 4219 and 4225 of the Revised Statutes of 1873. Sections 4219 and 4227 made express reservation for treaty rights. Thus, the Customs Regulations of 1884, issued by the Treasury Department, list the countries with which we have treaties preventing the imposition of such duties. Ibid., art. 290. Subsequent regulations continued to direct the imposition of the 50-50 tax on vessels of countries with which we have no treaties, but fail to list the treaty countries.[5] This is explained, as a matter of practice, by the fact that the United States, before the World War, has appropriate treaty arrangements with all the maritime countries of the world. The 50-cent taxes of sections 4219 and 4225 were therefore rendered ineffective generally by the treaties of commerce.
The Proclamation of December 3, 1896 (29 Stat. 884), was issued because it was found that Germany was imposing upon our ships dues which were deemed higher than those charged German vessels in the United States. The duty revived by the Proclamation, however, was not the 50-cent duty, but merely the 6-cent duty imposed under section 11 of the Act of June 19, 1886.
At the outbreak of the World War, then, the tonnage dues in question do not seem to have been levied because of general treaty exemptions. This was in keeping with the long-established American practice in favor of reciprocity. Although the Hanseatic Convention of 1827 and the Prussian Treaty of 1828 were not revived by the Treaty of Peace of November 11, 1921, the President on March 22, 1922, proclaimed the suspension of discriminating duties of tonnage upon German vessels on the basis of assurances of reciprocal treatment received from Germany on November 11, 1921. The further Treaty of 1923 again continues the former policy. It reads, in part, as follows:
"No duties of tonnage * * * levied in the name or for the profit of the Government, public functionaries, private individuals, corporations or establishments of any kind shall be imposed in the ports of the territories of either country upon the vessels of the other, which shall not equally, under the same conditions, be imposed on national vessels. Such equality of treatment shall apply reciprocally to the vessels of the two countries respectively from whatever place they may arrive and whatever may be their place of destination." 44 Stat. 2132.
It thus appears that at the first opportunity for expression by the governments, the reciprocity was resumed.
*421 In the light of this unbroken policy, and in view of the general exemption afforded to vessels of the other maritime nations, there seems to be no adequate reason for assuming that a different state of affairs was intended to prevail when trade relations, interrupted by war, are restored. The proclamation of March 22, 1922, suspending any discriminatory duties as of November 11, 1921, the effective date of the Peace Treaty, is no indication that prior thereto Germany was imposing discriminatory duties as against this country. Nothing has been adduced by counsel for the government to show that discrimination against American shipping by Germany did, in fact, exist during this period.
The holding in Karnuth v. United States, 279 U. S. 231, 49 S. Ct. 274, 73 L. Ed. 677, does not, in my judgment, cover the present facts. In that case, it was decided that article 3 of the Jay Treaty of 1783, providing for free passage of American and British nationals across the Canadian border, had been annulled and not merely suspended by the War of 1812. The theory of the decision clearly distinguished it from the case at bar. The free passage of persons, as was said by the court, "* * * is inconsistent with a condition of hostility. * * * The reasons for the conclusion are obvious  among them, that otherwise the door would be open for treasonable intercourse. And it is easy to see that such freedom of intercourse also may be incompatible with conditions following the termination of the war." 279 U. S. 239, 49 S. Ct. 274, 277, 73 L. Ed. 677.
It can readily be understood that the mere occurrence of war should have that necessary effect on rights of free passage and repassage. Before the war, each state may have felt secure in the expectation of a lasting peace. The incidence of war destroys that expectation; what has happened once may happen again. It is therefore necessary to reconsider the wisdom of allowing free passage over our unprotected borders and, in the meantime, not to recognize a treaty right thereto. The present case presents no such problem. If the question involved were the complete exclusion of German vessels, the analogy might be a fair one. The issue here is different. The right of entry is not denied; the only question presented is the treaty limitation on the power to tax. Taxation or no taxation cannot vitally affect the course of trade, for the taxes imposed are not so large as to be prohibitory. It is difficult to see how reciprocity of tonnage taxation can in any way affect the national safety, the right of entry itself being in no way denied. I am of the opinion, therefore, that the Hanseatic Convention of 1827 and the Prussian Treaty of 1828 were in force between July, 1919, and November 11, 1921, and that the plaintiff has accordingly set forth a cause of action.
Motion denied.
NOTES
[1] Upon vessels which shall be entered in the United States from any foreign port or place there shall be paid duties as follows: On vessels built within the United States but belonging wholly or in part to subjects of foreign powers, at the rate of thirty cents per ton; on other vessels not of the United States, at the rate of fifty cents per ton. Upon every vessel not of the United States, which shall be entered in one district from another district, having on board goods, wares, or merchandise taken in one district to be delivered in another district, duties shall be paid at the rate of fifty cents per ton. Nothing in this section shall be deemed in any wise to impair any rights or privileges which have been or may be acquired by any foreign nation under the laws and treaties of the United States relative to the duty of tonnage on vessels. On all foreign vessels which shall be entered in the United States from any foreign port or place, to and with which vessels of the United States are not ordinarily permitted to enter and trade, there shall be paid a duty at the rate of two dollars per ton; and none of the duties on tonnage above mentioned shall be levied on the vessels of any foreign nation if the President of the United States shall be satisfied that the discriminating or countervailing duties of such foreign nations, so far as they operate to the disadvantage of the United States, have been abolished. In addition to the tonnage-duty above imposed, there shall be paid a tax, at the rate of thirty cents per ton, on vessels which shall be entered at any custom-house within the United States from any foreign port or place; and any rights or privileges acquired by any foreign nation under the laws and treaties of the United States relative to the duty of tonnage on vessels shall not be impaired; and any vessel any officer of which shall not be a citizen of the United States shall pay a tax of fifty cents per ton.

A duty of fifty cents per ton, to be denominated "light money," shall be levied and collected on all vessels not of the United States, which may enter the ports of the United States. Such light money shall be levied and collected in the same manner and under the same regulations as the tonnage duties.
[2] That in lieu of the tax on tonnage of thirty cents per ton per annum imposed prior to July first, eighteen hundred and eighty-four, a duty of three cents per ton, not to exceed in the aggregate fifteen cents per ton in any one year, is hereby imposed at each entry on all vessels which shall be entered in any port of the United States from any foreign port or place in North America, Central America, the West India Islands, the Bahama Islands, * * * or Newfoundland; and a duty of six cents per ton, not to exceed thirty cents per ton per annum, is hereby imposed at each entry upon all vessels which shall be entered in the United States from any other foreign ports, not, however, to include vessels in distress or not engaged in trade: * * * Provided, further, That such proclamation shall exclude from the benefits of the suspension herein authorized the vessels of any foreign country in whose ports the fees or dues of any kind or nature imposed on vessels of the United States, or the import or export duties on their cargoes, are in excess of the fees, dues, or duties imposed on the vessels of the country in which such port is situated, or on the cargoes of such vessels; and sections forty-two hundred and twenty-three and forty-two hundred and twenty-four, and so much of section forty-two hundred and nineteen of the Revised Statutes as conflicts with this section, are hereby repealed.
[3] The Disconto Gesellschaft v. Umbreit, supra. See U. S. For. Rel., 1883, p. 369; 1885, pp. 404, 443, 444; 1887, p. 370; 1895, p. 395; 12 Op. Attys. Gen. 463. See also U. S. v. Diekelman, 92 U.S. 520, 23 L. Ed. 742. See letter of the Solicitor of the Department of State, Oct. 1, 1913, 50 Cong. Rec. Pt. 6, 63d Cong., 1st Sess., 5345. As recently as 1915, the German government regarded the treaty as in force, U. S. For. Rel., 1915, pp. 435, 645. The same view has been held by our own Department of State. See Goos v. Brocks, supra. See also Niemeyer, Urkundenbuch zum Seekriegsrecht, 22.
[4] See the collection of treaties in Crandall, Treaties, 452 et seq. and in Phillipson, Termination of War and Treaties of Peace, 254 et seq. Also 2 Fauchille, supra, 56 et seq.
[5] See Customs Regulations: 1892, art. 182; 1899, art. 182; 1908, art. 175; 1915, art. 115; 1923, art. 119 (still in force).